**No. 3638.]**

THE CACHE LA POUDRE RESERVOIR CO. v. THE WATER SUPPLY & STORAGE CO. ET AL.

1. WATER RIGHTS—APPROPRIATION—TIME OF USE.
Appropriation of water can only be made by an actual diversion followed by an application thereof, within a reasonable time, to a beneficial use. One may make a prior appropriation of a certain quantity of water to be enjoyed for a certain part of the year, and afterwards another may appropriate from the same source a like quantity to be used for the balance of the year, and as to the respective parts of the year the water has been used by each, each would be a prior appropriator.

2. WATER RIGHTS—APPROPRIATION—CHANGE OF USE.
Where water is appropriated for the purpose of furnishing power to a mill, and after its use is permitted to flow, undiminished, back into the natural stream, it becomes subject to another appropriation,

and when so appropriated the mill appropriator cannot change the character of use or place of diversion in such manner as to injure or deprive the latter appropriator below the mill of his use of the water.

3. WATER RIGHTS—APPROPRIATION—PRIORITIES.

Where water has been appropriated for mill purposes, and after its use permitted to flow back into the natural stream, and is afterwards appropriated during the winter months for the purpose of storage in a reservoir, from where it is afterwards used for irrigation, the appropriator for storage purposes acquires a prior right to the use of the water during the months he has appropriated it, and such priority cannot be defeated by an abandonment of the mill appropriation in favor of, or by transfer to a reservoir appropriator above the mill whose appropriation for storage purposes is prior to the appropriation below the mill, but subsequent to the mill appropriation.

*Appeal from the District Court of Larimer County.*

Mr. VICTOR A. ELLIOTT and Mr. H. N. HAYNES, for appellant.

Messrs. ROGERS & SHAFROTH, Mr. J. E. GARRIGUES and Mr. H. C. VIDAL, for appellees.

CHIEF JUSTICE CAMPBELL delivered the opinion of the court.

The appellant here was plaintiff, and the appellees were defendants, below. For the sake of brevity and convenience, in the opinion, the appellant is designated as the plaintiff, and the defendant Water Supply and Storage Company as the "water company," and the Colorado Milling and Elevator Company as the "milling company." The ultimate and substantial facts alleged in the voluminous complaint are in the main fairly summarized by defendants' counsel in their brief as follows:

In 1868 the defendant milling company constructed a ditch diverting from the Cache la Poudre river sixty cubic feet of water per second of time to be used in propelling its mill

machinery, and then, undiminished in quantity and unimpaired in quality, discharged the same into the river. Such use the milling company has made of the water continuously from that time to the present, both winter and summer, nights and days, excepting only when, for some cause, the mill was not in actual operation.

In 1881 the defendant water company constructed a ditch taking water directly from the river at a point above the head-gate of the milling company's ditch, and the uses actually made of such appropriation were the irrigating of agricultural lands during the summer season, and the storing of water, outside of the winter months, in certain of its reservoirs, having an aggregate storage capacity of 500,000,000 cubic feet, and then using it in the latter part of the season for irrigating lands belonging to its stockholders.

In 1892 the plaintiff reservoir company constructed a ditch taking water from the river at a point below the discharge of the milling company's ditch, and the object of this appropriation was to store the water in its reservoir, having a storage capacity of 450,000,000 cubic feet, to be used during the late irrigation season for irrigation purposes.

There are sixty-five ditches which rightfully divert and take for irrigation all of the water which flows in the river during the irrigating season, except during the period of floods in the month of June, when there is some water available for storage.   Between November 1 and April 1 of each year, prior to the winter of 1892–1893, the amount of water which was accustomed to flow in the river down to the place where now is located plaintiff's head-gate was about sixty cubic feet per second, sometimes more, sometimes less.   During this winter the sixty cubic feet of water diverted and used by the milling company for propelling its machinery and afterwards discharged into the river, flowed down and was taken into the head-gate of the plaintiff company's ditch, where it was by it diverted and stored in its reservoir.

Beginning with the winter of 1893–1894, and continuing during the following winter, the defendant water company di-

.verted the waters of the stream on Sundays and at such other times as the mill of the defendant milling company was not in actual operation, and thereby intercepted the flow of said sixty feet, which during the winter of 1892–1893, and theretofore ran continuously and without diminution to the place where now is the head-gate of the plaintiff company, and caused this flow to become intermittent, running only at such times as the mill was in actual operation, and then not in the quantity theretofore flowing, on account of the mill race becoming clogged with ice caused by defendant's wrongful diversion. The defendant water company now refuses to recognize that the plaintiff reservoir company has any right to divert waters from the river for storage between the 1st of November and the 1st of April to the extent of sixty feet, or to any extent, senior to the right claimed by it to divert waters during the same period for storage in its reservoir; and it claims the right to induce the milling company, for a consideration (and proposes and threatens to accomplish that end), to keep idle its mill during all, or a part, of the winter months, or to cease its operation by water power, in order that, during such time, the water company may divert water for storage. In other words that, by collusion, these two defendants threaten to bring about an abandonment by the milling company of its right to use its appropriation of water for power purposes; and thus seek, indirectly, to confer upon the defendant water company the opportunity and assumed right to take it out and absorb it at a different place, and for a different purpose, to the injury of plaintiff.

It should be borne in mind that it is distinctly alleged in the complaint that, prior to the winter of 1893–1894, and not until after the plaintiff company had made its appropriation, the defendant water company had never diverted in the winter time any water whatever from the river, to the extent of sixty cubic feet, or any other quantity, either during nights, Sundays, or at intervals when the mill was not in actual operation, although such temporary nonuse for power purposes had frequently occurred; and that not until after the plaintiff

had, as just stated, made its appropriation of all the winter flow of the river, including the water discharged from the mill race into the river after having been used to operate the mill, did the defendant water company begin its diversion. This diversion thus for the first time begun by the defendant water company, according to the allegations of the complaint, has prevented the plaintiff company from getting into its reservoir during the winter season the waters it is entitled to, and the defendant water company threatens to continue its diversion to the detriment of the plaintiff.

The milling company suffered a default, and the other defendants filed a demurrer to the complaint containing several grounds, but the only one argued by counsel on this appeal is that the complaint does not state facts sufficient to constitute a cause of action, and to this our consideration is confined.

From the foregoing statement it clearly appears that after the use and subsequent discharge into the stream of the sixty cubic feet of water diverted by the milling company, the first beneficial use thereof, as well as of other so-called winter waters, was made by the plaintiff; and that no attempt was made by the water company to cause any waters to flow in its ditch until a year after the plaintiff had actually stored water in its reservoir.

Neither party questions the first priority of the milling company, so that question is eliminated. The case may first be considered as though all allegations concerning the mill ditch were absent, though this method will occasion some repetition.

To sustain its claim to the first appropriation of the winter waters of the stream, counsel for the water company makes a plausible and ingenious argument. It is this: When, in 1881, it conceived its plan for diverting water for irrigation and storage, it was confronted with senior demands existing against the flow of the river for irrigation and milling purposes. Whether these demands were satisfied by means of ditches above or below its intake, defendant was obliged to

respect them irrespective of the character of the use. Though these prior demands absorbed all the waters of the river, yet the quantity actually needed was not at all times equal to its actual volume. Therefore, if there were occasions when all, or a portion, of the waters were not used, the defendant, for such periods, could acquire a right to divert and enjoy what was not used by senior appropriators. That is to say, although the rights of these senior appropriators, when fully exercised, would consume the entire flow, yet they may not waste water, and when they did not need all, or any portion, a junior appropriator might, at such times, use such unused waters, and as to the same would become a prior appropriator himself. Or, as expressed in the exact language of counsel: "The moment that a claim to water ceases to be exercised partially or totally the water in the river from the source to its mouth is relieved to that extent of any legal right in the claimant, and it is, as to succeeding claimants, unappropriated water."

For the purposes of this case, we may concede the validity of the argument up to this point, and further concede that this statement defines the *status* of the defendant company with respect to senior appropriators; and that when they ceased to use water, it became subject to appropriation. Therefore, as the argument proceeds, the defendant might acquire a right to divert such unused waters, either for irrigation or for storage. Indeed, we might go further, and say that it may have perfected its right thus to take water during the summer season. But the argument stops short here, probably for the reason that the facts of this case require it. For if the water company did not make such an appropriation to be enjoyed during the winter season (which is directly negatived by the complaint) until after the plaintiff made its appropriation, and limited to that season, the latter, as to the volume of water actually appropriated by it, becomes the senior appropriator as to the winter flow.

Applying the foregoing principles to the admitted facts of this case, it appears that, as to sixty cubic feet of water, the

plaintiff first appropriated it for storage purposes during the winter season. While the ditch and reservoir of the water company were first built and its facilities for storing winter waters antedated those of the plaintiff, the former did not, as a matter of fact, store, or attempt to divert for storage, any water of the river between November and April of any year until after the plaintiff made its appropriation for that period during the winter of 1892–1893. For aught we know, the water company may have a superior right to store waters during other seasons of the year, but, by its demurrer, it admits that the plaintiff made the first appropriation for the winter season.

No right is acquired by merely possessing facilities for making an appropriation, unaccompanied by a *bona fide* attempt within a reasonable time to utilize them. Under our law an appropriation can be made only by an actual diversion of water followed by an application thereof, within a reasonable time, to a beneficial use. The fact, therefore, that the defendant water company, from 1882 to 1892, and during the winter seasons of these years, neither diverted water nor beneficially applied it until after the plaintiff made its diversion in 1892, makes the former the junior appropriator, and the latter the senior, for such periods of time, as to the quantity actually appropriated by the latter.

While no case in this court may have required the announcement, it seems, both upon principle and authority, that one may make a prior appropriation of a certain quantity of water to be enjoyed for a designated period of time, and another person an appropriation of a like quantity from the same source during another period, and as to the same be a prior appropriator himself. In other words, there is no difference in principle between " an appropriation measured by quantity and an appropriation measured by time." · Kinney on Irrigation, § 177, *et seq.*, and cases cited; Black's Pomeroy on Water Rights, §§ 69, 91, 92, and cases cited; *Barnes v. Sabron,* 10 Nev. 217; *Smith v. O'Hara,* 43 Cal. 371, and cases cited.

But we apprehend that the principal object of the action was to obtain an adjudication of the conflicting claims of the plaintiff reservoir company and the defendant water company to the milling company's appropriation at such times as the latter temporarily ceased to use the same, or in the event that it wholly ceased to use, with no intention of reclaiming, its right. Considering the case, then, as it is made in the complaint, with the element of the mill race present, let us see if that makes any difference in the principle just announced. Of the three head-gates, that of the water company is highest up the stream and that of the plaintiff the lowest, while the intake of the mill race is between the two. For twenty-four years sixty cubic feet of water per second of time had been continuously flowing into the mill race, and for ten years the water company had permitted it to pass by its head-gate recognizing the prior right of the milling company thereto; and during these years, even when the milling company ceased temporarily to use it in operating the mill (as it frequently did for short periods of time), the water company, during the winter season, did not attempt to make any use of the milling company's appropriation.

After this volume of water fulfilled its mission of running the mill machinery, it was turned back into the natural channel, and such have been the extent and method of use by the milling company since the day of its appropriation. In effect, the milling company thereby gave notice to the public that its only use of this water was for power purposes, and when that function was performed, its claims terminated, and such, indeed, is the only claim it now makes. After the water had again reached the natural channel, the plaintiff had the right to appropriate it directly from the stream, and such right is entitled to protection under the law. When the milling company ceased to use this water, the water company has no prior right over the plaintiff, for the latter first appropriated it. That the water company wanted to use it, or was prepared to use it if he could get it, but did not until

after the plaintiff appropriated it, is no reason why the latter's rights should be subordinated to those of the former.

Now, it is further manifest that after the plaintiff made its appropriation, while the milling company may change the character of its use, or the place of diversion, it may not do so to the injury of the former. *Strickler v. Colo. Springs,* 16 Colo. 61. Neither could it, by sale to the water company or other person, empower its grantee to do what it could not do. But, say counsel, plaintiff may not compel the milling company to divert water into its race for the former's benefit, and therefore the latter may cease altogether to use its mill race. True, but is this equivalent to holding that it may, by abandonment, confer, or that it may make such other use of its appropriation as to confer, upon others a right to deprive the plaintiff of its appropriation?

This leads to a consideration of the second general contention of defendants, that when the milling company ceases temporarily, or, as in case of abandonment, permanently, to exercise its rights, the water theretofore diverted must be allowed to flow in the stream subject to appropriation by other appropriators higher up the stream in accordance with their relative priorities, irrespective of the question whether or not the unused or abandoned waters have been appropriated by ditch owners farther down the stream before the date of such temporary or permanent nonuse.

It is somewhat singular in this case that opposing counsel rely upon the same authorities, which are cited in all the briefs, though not so strange that they disagree in their conclusions drawn therefrom, or as to the legal effect of an abandonment. The position of defendants is that, when an abandonment occurs, the situation is as though no appropriation had ever been made; and at the very moment an abandonment occurs, the water resumes its original quality of being a part of the public waters, and may be taken by other appropriators in the order of their original dates of priority.

It has been determined, where an appropriation of water for a use that wholly absorbs it, as for irrigation, is abandoned

and allowed to flow into the stream above the head-gates of all the ditches, or when the stream, from whatever cause, has at such point received an increase in volume, the right to the use of the increased quantity is in accordance with the priorities of the several ditches. Kinney on Irrigation, §§ 183, 259. We are not called upon to declare how abandoned water in all cases should be distributed, but we are to lay down the rule to govern in a case like the one at bar, and where the use is a nonabsorbing one. So long as the milling company was using, and then discharging into the stream, the water whose benefits it had enjoyed, this returned water was, as to the milling company, abandoned water; that is, it had used it for a certain purpose, and thereafter made no further claim to it. But ditch owners above, owing to a physical law, could not then claim it. It then became subject to appropriation; and when once it was appropriated by a ditch owner below the place of discharge, ditch owners higher up the stream are not entitled to it, either during temporary non-use, or after abandonment, though their priorities as to other quantities of water, or for other seasons of the year, may be prior in time. The lower ditch owner, in other words, is himself the prior appropriator of this so-called abandoned water. To hold otherwise would be to take away from a ditch owner below who had made an actual beneficial use of water something which he theretofore used, and give to another higher up the stream that something which the latter theretofore never had enjoyed, or had the opportunity or right to enjoy.

It follows, therefore, when the plaintiff went upon the stream and saw the use that was being made of water by the milling company and then made its appropriation, no subsequent act of omission or commission by the milling company could operate to the injury of the plaintiff; and by virtue of its appropriation, the plaintiff, on the basis of then existing conditions, secured a vested right to have the water continue to flow either from the mill race or from the stream itself, in substantially the same quantity as it flowed when

its appropriation was made.    The plaintiff, though junior
to the milling company, in so far as the use of the water
for power purposes is concerned, is a senior appropriator
to the milling company as to the water which the former
appropriated after it left the mill race.    That right was just
as valid as was the prior right of the milling company for
power purposes, and each becomes a vested right.    *Lobdell v.
Simpson*, 2 Nev. 274; *Ortman v. Dixon*, 13 Cal. 33; *Last
Chance, etc., M. Co. v. Bunker Hill & S. M. & C. Co.*, 49
Fed. Rep. 430; Kinney on Irrigation, §§ 234, 253, 254, 259,
and cases cited.

This conclusion would seem to be in accordance with equity,
and, in principle, well established by the authorities cited.
The water company could not, by purchase, acquire from the
milling company any superior right to this sixty cubic feet of
water appropriated by the plaintiff, for the milling company
had no prior rights to convey.    Why, if the milling company
ceases temporarily or permanently to use its appropriation
the water company could, or should, obtain a right which it
could not get by purchase, is difficult to perceive, for one
may not abandon a right in favor of another.

An illustration used by plaintiff's counsel serves to bring
out more clearly this point.    Suppose the water company
owned all the water rights, both for irrigation and milling, on
this stream, and had used them for years, as the present
owners have done.    Could it, after the plaintiff had made its
appropriation, change the character of the use of the mill
appropriation, and use the same quantity of water during the
winter season for storage in its reservoirs, and thus prevent
plaintiff from enjoying its appropriation during the same sea-
son?    Or could it change the place of diversion by discharg-
ing water from the mill race at a point below the plaintiff's
head-gate in order to store it in some reservoir that it might
own farther down the stream?    Manifestly not; and, if not,
why should a different result follow by any act of the present
owners, whether they act in conjunction, or entirely independ-
ent of each other?

The judgment should be reversed, and the cause remanded, with instructions, if further proceedings be had, that they be in accordance with the views herein expressed.

*Reversed.*