# HARDY et al. v. BEAVER COUNTY IRR. CO.

### No. 3459.    Decided December 27, 1924.    (234 P. 524.)

1. WATERS AND WATER COURSES—JUDGMENT DETERMINING RIGHTS MUST BE DEFINITE. Judgment defining and determining conflicting rights in and to use of water must be definite and certain as to relief granted.[1]

2. WATERS AND WATER COURSES—APPROPRIATION MUST BE PROVED WITH CERTAINTY. Claimants in action to determine priority of rights in waters by appropriation must prove the extent of their appropriations both in time and amount with certainty.[2]

3. WATERS AND WATER COURSES—RIPARIAN RIGHTS BY PERCOLATION AND NATURAL OVERFLOW NOT RECOGNIZED. Claims to waters from a river based on percolation and natural overflow therefrom are but assertions of riparian rights which are not recognized in Utah.[3]

4. WATERS AND WATER COURSES—APPROPRIATION LIMITED BY TIME AND AMOUNT OF USER. An appropriation of water is limited by time and amount; that is, an appropriator's right is limited by the quantity of water which he has beneficially used during the period of the year when he has actually been accustomed to use it.

5. WATERS AND WATER COURSES—DUTY OF APPROPRIATOR TO PREVENT WASTE. Where land can with reasonably efficient systems of canals and laterals be irrigated in the usual manner, it is the duty of appropriators of water therefor to so prepare the land, by leveling or otherwise, that it may be irrigated with reasonable economy in the use of water, to provide themselves with reasonably efficient means for diverting and applying the water, and to use it in the customary manner and at the usual season of the year that the greatest possible use may be made of the natural resource.[4]

6. WATERS AND WATER COURSES—DECREE MUST FIX EXTENT OF APPROPRIATIONS AND POINTS OF DIVERSION. A party to a suit to determine rights to waters of a river clearly having right to divert, impound, and use whatever surplus water there may

---

[1] Sharp v. Whitemore, 51 Utah, 14, 19, 168 P. 273, 274.

[2] Sowards v. Meagher, 37 Utah, 222.

[3] Stowell v. Johnson, 7 Utah, 215, 26 P. 290.

[4] Big Cottonwood-Tanner Ditch Co. v. Shurtliff, 49 Utah, 307, 164 P. 856.

Appeal from Fifth District

be at any time after the rights of the other parties have been satisfied, the decree should fix the extent of the appropriation of each of the others as well as their several points of diversion, that the rights of the first party may be definitely determined.[5]

7. APPEAL AND ERROR—EQUITY CASE NOT FINALLY DISPOSED OF ON APPEAL WHERE, THOUGH FINDINGS ARE WRONG, IT CANNOT BE DETERMINED FROM RECORD WHAT THEY SHOULD BE. While ordinarily in an equity case the Supreme Court, if unable to agree with trial court's findings, either makes findings or directs what they shall be, to end the litigation, where though findings were erroneous, because on a wrong theory, it is impossible to say from the record what the rights of the parties are, case will be remanded for further trial.

8. WATERS AND WATER COURSES—PRIOR RIGHT TO USE OF WATER FOR IRRIGATION BY WASTEFUL USE NOT ACQUIRED. A prior right to use of water for irrigation by the wasteful method of permitting it in the winter to run onto and spread over all claimant's land as well as the adjoining lands, regardless of whether they were being irrigated or were fit for irrigation, could not be acquired as against one having right to impound surplus water.

Appeal from District Court, Fifth District, Beaver County; *D. H. Morris*, Judge.

Action by William L. Hardy and others against the Beaver County Irrigation Company, with cross-complaint by defendant against plaintiffs and others. From adverse decree, defendant appeals.

REVERSED, with directions.

---

[5] *Sharp* v. *Whitemore*, supra; *Nephi Irr. Co.* v. *Jenkins*, 8 Utah, 369, 31 P. 986; *Nephi Irr. Co.* v. *Vickers*, 15 Utah, 274, 49 P. 301; *Lost Creek Irr. Co.* v. *Rex*, 26 Utah, 485, 73 P. 660.

Headnote 1.  40 Cyc. p. 736.
Headnote 2.  40 Cyc. p. 733.
Headnote 3.  40 Cyc. p. 557.
Headnote 4.  40 Cyc. pp. 557, 715.
Headnote 5.  40 Cyc. p. 716.
Headnote 6.  40 Cyc. p. 735.
Headnote 7.  4 C. J. p. 1202.
Headnote 8.  40 Cyc. p. 716.

*William Story*, of Salt Lake City, for appellant.

*O. A. Murdock*, of Beaver, and *D. N. Straup*, of Salt Lake City, for respondents.

IVERSON, District Judge.

This appeal involves a general adjudication of water rights on that segment of the Beaver river extending from the lower end of what is commonly known as the "Beaver Valley" to a point approximately 14 miles below the town of Milford. The testimony is very voluminous, but for the purpose of this opinion it will suffice to make a statement of the following facts, which are established by the record:

From the Beaver Valley the river flows through a canyon approximately 7 miles in length from the lower end of which it traverses a tract of land owned by the appellant, comprising approximately 15,000 acres, commonly referred to in the testimony as the "Milford Project," and flows thence through a tract of lowland, bordering the river channel on either side, some 5 miles in length, referred to in the testimony as the "Milford Bottoms"; thence through a series of hills a distance of several miles, from which it emerges into what is commonly known as the "Beaver Bottoms," a valley varying from 1 to 2 miles in width and from 10 to 15 miles in length. Until it reaches Beaver Bottoms, the river is generally confined to a single and more or less well-defined channel, but there it divides into two channels, one of which extends along the west and the other along the east side of the valley, in more or less well-defined courses, until they reach the land of those of the respondents whose farms are situated some 7 or 8 miles from the upper end of the valley, where the identity of the channels is lost in numerous swails and depressions.

At the upper end of the canyon which has been mentioned, the appellant has constructed a dam, commonly known as the "Rocky Ford Dam," and has thereby created a reservoir covering the channel of the river having an impounding capacity of approximately 28,000 acre-feet.

Near the lower end of the canyon, the Minersville Reservoir & Irrigation Company, the original appropriation of which antedates those of the respondents, has its point of diversion from the river. At the time of construction of the reservoir, appellant acquired all the rights of the Minersville Reservoir & Irrigation Company in the river, subject to an interest reserved by such company of 7,500 acre-feet.

The river has its principal source of supply in the Tushar range of mountains, although the record shows that at times, during the latter part of the winter and early spring, there is a considerable contribution to the stream of water which accumulates from the melting snow in the Milford Valley and from the mountain ranges which flank the valley on either side.

As is usual in mountain streams, there is a wide variance in the volume of water which flows in the river at different seasons of the year, the flood or high water usually commencing about the middle of May and lasting until the latter part of June or first of July, while during the summer season and early fall, comprising the months of July, August, and September, the flow of the stream recedes to such an extent that there is rarely, except at times of unusually heavy rainfall, more than a few second-feet of water in the stream at the Minersville point of diversion in excess of that diverted and used by the appropriators from the stream in the Beaver Valley. After irrigation ceases in the Beaver Valley, there is a substantial flow of water in the segment of the river under consideration, except when it is impounded in the reservoir constructed by the appellant, which usually continues during the late fall and winter months, until about the middle of March, when ordinarily there is another season when the river, in the Milford and Beaver Bottoms, is dry, due to the use of the water by the upper appropriators, which lasts until the commencement of the succeeding high-water season. The aggregate run-off of the river at the lower end of the Beaver Valley, over the annual period, varies greatly in different years, depending upon the season, receding to approximately 18,000 acre-feet in some years and increasing to approximately 46,000 acre-feet in others.

In former years, before the flood waters of the stream were diverted to any great extent for irrigation in the Beaver Valley or impounded in the reservoir constructed by the appellant, most of the land in the Milford and Beaver Bottoms appears to have been more or less inundated during the high-water season, as well as at times during the winter season, and seemingly more of an effort was made by the owners of land on both the Milford and Beaver Bottoms, by the construction of dams and dikes, to divert the water away from rather than to and upon their land for the purpose of irrigation. However, it appears that prior to the construction of the appellant's reservoir, in the years 1913 and 1914, the average run-off of the stream in the Milford Valley had been materially decreased by diversion in the upper valley and that of the Minersville Reservoir & Irrigation Company, and a number of respondents—mainly the original plaintiffs, in the action—by means of dams constructed in the river channels and in the swails into which the water overflowed during the flood season, and also in a number of instances by means of ditches, had been accustomed to divert water from the river to and upon their land for the purpose of irrigating their crops consisting principally of wild hay, grain and alfalfa. It appears from the evidence, however, that their irrigation systems for the most part were and still are extremely crude and inefficient, and that little, if anything, has been done by any of the respondents in the way of leveling, cross-ditching, and otherwise preparing their land for reasonably efficient irrigation.

Owing to the diversion of all the water in the stream by the upper appropriators during the low-water season, in July, August, and September, the appropriators from the river on the Milford and Beaver Bottoms were accustomed to irrigate their crops once during the latter part of March or early in April, when there was water available for the purpose, and again during the season of flood flow, giving them, one or at most two, irrigations, as the condition of the crop required. By means of such irrigations, they were enabled to mature their grain crops and raise two crops of alfalfa or one crop

of hay and a crop of alfalfa seed. While the respondents allege in their pleadings that it was also their custom to use the water which flowed in the river during the winter for irrigation purposes, the evidence fails to show, with any degree of certainty, that there was any general use of the water in that manner or that such water as was used during the winter season accomplished any beneficial result.

While these conditions prevailed on the stream, the appellant and its predecessors in interest, by various filings in the office of the state engineer, acquired the right to divert, impound, and use the surplus water in the river for irrigation purposes on the land now included in what has been mentioned as the "Milford Project" and other land in the Milford Valley, and in the years 1913 and 1914, having also acquired the old rights of the Minersville Reservoir & Irrigation Company, as above related, and those of certain appropriators from the river in the Beaver Valley, constructed the reservoir to which reference has been made, for the purpose of impounding therein the waters of the river after the close of the usual irrigation season in the fall and during the winter season, as well as the surplus flood water in the spring, and, since the completion of its reservoir, except during two brief intervals, has regularly impounded the water of the river at such seasons of the year.

The present action was commenced in 1916 by certain of the respondents, who are the owners of land on the Milford and Beaver Bottoms, to restrain the appellant from impounding the water of the river during the fall or winter seasons or during the season of flood flow, except to the extent of such surplus water as they do not require for irrigation of their crops, and generally to quiet their rights to use the water in the manner hereinbefore described. Thereafter certain others of the respondents, intervened and were joined as plaintiffs in the action.

In its answer and cross-complaint, the appellant pleaded the several rights which it had acquired from the Minersville Reservoir & Irrigation Company and other appropriators in the Beaver Valley, as well as those which it had acquired by

filings made in the office of the state engineer, and also joined as cross-defendants all the remaining claimants of appropriations from the river on the Milford and Beaver Bottoms who had not previously joined as plaintiffs or interveners in the action.

It is unnecessary, for the purpose of this opinion, to set forth all the findings of fact and legal conclusions of the trial court, as they are quite voluminous. Those deemed pertinent to the present discussion are in substance that prior to any extensive use of water from the river for irrigation purposes in the Beaver Valley, the respondents and their predecessors in interest settled upon the land in the Milford and Beaver Bottoms bordering upon the river, and by means of dams constructed in the river channel and in the swails and other more or less undefined channels into which the water from the main channel overflowed during the flood season, as well as by means of ditches leading therefrom, conveyed the water to and upon their land, thereby causing the water from such swails and the natural channels of the river to percolate into their land, rendering it productive, and thus appropriated the water of the stream to the extent of their necessities for such purpose; that for approximately 20 years prior to the commencement of the action, the appellant and its predecessors in interest had diverted all the water flowing in the stream at and above the so-called Minersville point of diversion during the summer season (i. e., between April 1st and October 1st, except during periods of flood flow), but that during the winter seasons there had been water in the stream available for use by the respondents varying in volume from year to year, at times largely in excess of and at other times wholly insufficient to meet their requirements; that, in consequence of their inability to obtain water except during the period of flood flow in the summer season, the respondents and their predecessors in interest, prior to construction of appellant's reservoir, had appropriated the entire flow of the river during the winter season i. e., between the 1st of October and the 1st day of the following April) for the purpose of saturating their soil; and that by thus supplementing their flood

rights in the manner indicated they had been able to raise valuable crops which, without the use of such winter water, they would have been unable to raise.

The trial court further found that it was necessary to apply 26 acre-inches of water on the land in the Beaver Bottoms, and 12 acre-inches of water on the land in the Milford Bottoms during the winter season, together with 12 acre-inches of water during the period of flood flow in the summer season, delivered on the land, in order to saturate the same to the extent of its water-holding capacity for crop growing purposes, as well as that such quantity of water was reasonably necessary for such purpose. The court also found, however, that when the volume of water flowing in the river during the winter season is insufficient to furnish respondents with the amount hereinbefore stated, it is necessary for them to divert an additional quantity of water during the flood season in the summer, varying in amount in proportion to the shortage in the winter time, and also that if the water were applied upon the land when necessary in reasonable quantities, during the usual irrigation season in the summer time, 3 acre-feet per acre on the Beaver Bottoms and 2 acre-feet per acre on the Milford Bottoms, delivered on the land, would be reasonably sufficient for irrigation of the same.

By its twenty-seventh finding of fact, the court determined that—

"The quantity of water flowing down said river to Milford Bottoms and Beaver Bottoms during the winter season at times has been and will be in excess of the quantity which would supply plaintiffs 26 acre-inches of water to each acre of land on Beaver Bottoms, and 12 acre-inches of water to each acre of land on Milford Bottoms during that season if said flow could be handled methodically and equally applied to said lands; but owing to freezing, said water spreads upon the upper lands of said Bottoms as well as the intermediate lands, and in the channels, swails, depressions, and ditches aforesaid, forming large bodies and sheets of ice, percolating into the ground, traveling underground on its course down through said bottoms and raising the water-plane therein near the surface of said bottoms, and then thawing rapidly in the warm weather, portions of said water unavoidably escaping application to the lands of the plaintiffs; and the court further finds that it is impossible to determine any excess flow of water

in the winter season which the defendant Beaver County Irrigation Company might retain in its reservoir without injury to and interference with the right of the plaintiffs."

It also found that, while the natural flow of the river during the summer season usually exceeds the prior rights of the appellant, such excess is extremely variable both in time and quantity, and that it is impossible to determine the amount of water which the appellant may retain in its reservoir during the flood season, and yet allow a sufficient quantity to pass through its reservoir to satisfy the prior rights of the respondents.

The court reached the conclusion from the facts so found by it that, after the prior rights of the appellant to divert and use 40 second-feet under its Minersville and other old appropriations have been satisfied, the respondents are entitled to divert and use the quantities of water so found by it to be necessary for the irrigation of the land situate in the Milford and Beaver Bottoms, respectively, but that, owing to the variability and uncertainty of the flow of the river in both the summer and winter seasons, and the consequent inability to permit the storage of any water flowing in the river in excess of the respondents' appropriations without infringing upon their rights, they (the respondents) are entitled to have all the water in the river, in excess of the prior right of appellant to 40 second-feet during the summer season, continue to flow, without interference or interruption by it, for use in irrigating their land.

By its further conclusion, however, the court determined that if it should elect so to do, the appellant should have the right to store in its reservoir all the water flowing in the river at any season of the year on condition that it would release therefrom for the use of the respondents, at such time as the court might thereafter determine, such quantity of water as might be necessary to furnish the appropriators on Beaver Bottoms 3 acre-feet and those on Milford Bottoms 2 acre-feet per annum measured at their respective points of diversion, but limiting the rights of the respondents to the total flow of the river in excess of the primary right of the appellant in case the water supply should be insufficient to satisfy their

appropriations in full. The decree conforms with the conclusions so reached by the court.

The appellant challenges the decision on numerous grounds; but in view of the conclusions which we have reached, it will be unnecessary, for the purposes of this opinion, to discuss any except those on which our decision is based, and those which are likely to arise in a retrial of the case.

The appellant insists that the evidence is insufficient to sustain the findings of the trial court with respect to beneficial use of the water by the respondents during the winter season, and the limits, both as to time and quantity, of their appropriations during the summer season, and we are asked to review the evidence relating to such matters under the rule announced by this court in *Big Cottonwood-Tanner Ditch Co.* v. *Shurtliff,* 49 Utah, 307, 164 P. 856.

It is apparent from the findings of fact which we have quoted, in substance, that the corner stone of the trial court's decision and the basis of its award of 36 acre-inches of water per annum to the respondent appropriators for land in the Beaver Bottoms, and 26 acre-inches per annum for land on the Milford Bottoms, is their alleged appropriation of the winter flow of the river, and unless the evidence shows that respondents had, in fact, appropriated the water by actual diversion and beneficial use thereof, prior to initiation of the rights of the appellant under its several filings in the office of the state engineer, it is evident that the amount of water awarded the respondents bears no relation to their actual appropriations.

While the respondents severally alleged, in their respective pleadings, diversions and beneficial use of the water during the winter season by themselves and their predecessors in interest, all such allegations were denied by the appellant. There is wide variation between the testimony given by some of the respondents from that given by others with respect to their use of the water during the winter season. Some of the respondents either failed to offer any evidence whatever in support of their allegations of use of water during such season, or testified without qualification that they made no use whatever of the water during such season for irrigation pur-

poses, and that they considered the application of water to the land during the winter a detriment rather than a benefit to the crops growing thereon, while others testified that, in exceptionally dry winters, they had been accustomed to give their land one irrigation, when there was water available for the purpose, as soon as the frost was out of the ground in February or March. Others testified that they had merely permitted the water to run through their ditches for the purpose of letting the water percolate therefrom and thus raise the water-plane in the land, while others based their claims of winter use of the water upon percolation or natural overflow from the river channel itself, with the attendant raising of the water-plane in the valley.

None of the respondents claim to have used the water throughout the winter season, and without exception such evidence as was offered by the several respondents in support of their respective claims is wholly insufficient in respect to the quantity used and period of use to satisfy that degree of certainty which is required to establish priorities to the use of the public waters of the state and to enable the court, by its decree, to establish the respective rights of the parties to the use of the common resource. As was said by this court in the case of *Sharp* v. *Whitemore,* 51 Utah, 14, 19, 168 P. 273, at 274:

"One of the essentials of a valid judgment is that the judgment be definite and certain respecting the relief granted. In judgments defining and determining conflicting claims, rights, and interests in and to the use of water in this arid region, the application of the foregoing rule is indispensable. The rule, the soundness of which is self-evident, is so well established that it would be a work of supererogation to cite authorities illustrating and supporting it."

It is but stating the corollary of the foregoing pronouncement to add that it is equally incumbent upon claimants in actions of this kind to prove the extent of their appropriations both in time and amount with the same degree of certainty. *Sowards* v. *Meagher,* 37 Utah, 222; *Walsh* v. *Wallace,* 26 Nev. 299, 67 P. 914, 918, 99 Am. St. Rep. 692.

The trial court evidently adopted the theory advanced by

the expert witness called by the respondents, who testified, in substance, that a reasonable duty of water, if used as required during the usual irrigation season in the summer, and applied by means of the existing canals of the respondents, would be 36 acre-inches per annum on the Beaver Bottoms and 26 acre-inches per annum on the Milford Bottoms, but that, since there is no water available for the respondents after the flood season in the spring, the equivalent of the full seasonal use of the water could be obtained by them only by storing water in the land during the winter time, such storage to be accomplished by raising the water-plane in the valley to the surface of the land during such season, which he estimated would require 26 acre-inches on the Beaver Bottoms and 12 acre-inches on the Milford Bottoms, and by completely saturating the land again during the high-water season to make up for the loss in such underground storage in the meantime, due to the dropping of the water-plane in consequence of the water seeking its level over the entire valley or to run-off of the subsurface flow.

In view of the court's finding that during the winter season the water in the river freezes and spreads upon the upper lands of the Bottoms, as well as the intermediate lands and in the channel, swails, ditches, and depressions resulting in the formation of large bodies and sheets of ice, percolating into the soil and traveling underground on its course through the Bottoms, and then thawing rapidly in warm weather, thus unavoidably causing part of the water to escape application to the lands of the respondents, it is not a little difficult to understand just how the trial court expected the water to be divided among the several respondents and to raise the water-plane under only those parts of the valley which had been irrigated; the total area of both Bottoms being approximately three times as great as the cultivated area for which water is claimed. Not to mention the obvious impossibility of restricting the application of the water to the land to which the respondents would be entitled to apply the same, and the gigantic waste of water which such manner of use would entail and which should not be countenanced unless impossible

to prevent, it is evident that the plan so suggested bears no resemblance or relation whatever to the actual use of the water which has been made thereof by the respondents as shown by their own testimony.

So far as the claims of respondents, based on percolation and natural overflow from the river channel, are concerned, they are but assertions of riparian rights which are not recognized in this state. *Stowell* v. *Johnson,* 7 Utah, 215, 26 P. 290. See, also, *Hutchinson* v. *Watson Slough Ditch Co.,* 16 Idaho, 484, 101 P. 1059, 133 Am. St. Rep. 125; *Walsh* v. *Wallace,* supra.

What the trial court was called upon to decide was not what would be the equivalent of a full seasonal appropriation by the respondents if there were water available for their use during the entire summer season, since the record shows conclusively that they did not use any water after subsidence of the flood flow in June, but the extent of the appropriation which they had actually made by diversion and beneficial use of the water.

It is elementary that an appropriation of water is limited by time as well as by amount; in other words, that an appropriator's right is limited by the quantity of water which he has beneficially used and the seasonal period during which he has used the same. *Santa Paula, etc.,* v. *Peralta,* 113 Cal. 38, 45 P. 168; *Cache Le Poudre, etc.,* v. *Water Supply Co.,* 25 Colo. 161, 53 P. 333, 46 L. R. A. 175, 71 Am. St. Rep. 131; *Ft. Lyon Canal Co.* v. *Chew,* 33 Colo. 392, 81 P. 39; *Gardner* v. *Wright,* 49 Or. 609, 91 P. 294. And in the case at bar the respondents' appropriations must be limited to the amount of water they can use beneficially during the period of the year when they have actually been accustomed to use the same.

To the extent that the respondents were accustomed to irrigate their land within the limits of beneficial use during the period between the opening of the irrigation season, viz., the time when their crops are usually planted, or begin to germinate, and the end of the flood or high-water season in the spring, the respondents' rights are prior

and paramount to those of appellant under its later appropriations; but as to the water flowing in the river during the remainder of the year, the rights of appellant are prior and superior to those of the respondents. In fact, the appellant concedes the priority of the respondents' rights to the extent which we have indicated; its contention with respect to the same being only as to the amount of water which the respondents require and beneficially use on the land, for which the water had been appropriated during such period when applied in a reasonably efficient manner.

Not only the expert witnesses called by appellant, but also the expert witness called by respondents themselves, testified that, with reasonably efficient systems of canals and laterals, the land on both the Milford and Beaver Bottoms, while seemingly unusual in some respects, can be irrigated in the usual manner. Such being the case, it is the duty of respondents so to prepare their land, by leveling or otherwise, that it may be irrigated with reasonable economy in the use of water, to provide themselves with reasonably efficient means for diverting and applying the water to their land. (Big Cottonwood-Tanner Ditch Co. v. Shurtliff, supra; Washington State Sugar Co. v. Goodrich, 27 Idaho, 26, 147 P. 1073), and to use the same in the customary manner, at the usual season of the year, to the end that the greatest possible use may be made of the natural resource.

In addition to attacking the decision of the lower court on the ground that the evidence is insufficient to support the judgment, appellant attacks the decree on the ground that it is so inconsistent and uncertain in its terms as to be incapable of enforcement.

The appellant clearly has the right to divert, impound, and use whatever surplus water there may be in the river at any season of the year, after respondents' rights have been satisfied, and it was the duty of the trial court to determine and fix the extent of the appropriation of each of the respondents, as well as their several points of diversion (as to which the decree is silent) since without such determination of respondents' prior rights, it is impossible to determine, with

any degree of certainty, the extent of appellant's rights.
*Walsh* v. *Wallace,* supra; *Sharp* v. *Whitemore,* supra;          6
*Nephi Irr. Co.* v. *Jenkins,* 8 Utah, 369, 31 P. 986; *Nephi
Irr. Co.* v. *Vickers,* 15 Utah, 374, 49 P. 301; *Lost Creek Irr.
Co.* v. *Rex,* 26 Utah, 485, 73 P. 660; *Riverside Water Co.* v.
*Sargent,* 112 Cal. 230, 44 P. 560.

"As the main purpose of such an action to quiet title is to de-
termine the respective rights of the parties to the use of the water,
or their rights in a ditch or canal, the decree should definitely
award the respective rights to the parties to the action. Therefore,
in order to have a decree conclusive upon the subject by its future
construction, it must be sufficiently definite and certain as to the
parties, the order of their respective priorities, the quantity of
water which each is entitled to use, the times when they are
entitled to use the water, and any other subject which the evidence
in each particular case may develop. A decree attempting to ad-
judicate the rights between the parties which is uncertain and in-
definite in fixing those rights, leaves the controversy between the
parties unsettled and unadjudicated, their respective rights un-
determined, and subject to future litigation, or reversal or modifica-
tion upon appeal. Therefore, the rendition of such a decree and
judgment, unless corrected upon appeal, defeats the very purpose
for which the action was brought. A decree and judgment must be
sufficiently certain to constitute an estoppel between the parties
and to be enforced by the court." Kinney on Irrigation and Water
Rights, vol. 3 (2d Ed.) § 1557, p. 2811.

In view of the record it was obviously impossible for the
court to arrive at a definite determination as to priorities and
the quantity of water which each of the parties was entitled
to use and the times when they were entitled to use the same.

So, by the terms of the decree, the appellant is denied the
right to divert or impound any surplus water there may be
in the stream, notwithstanding the evidence shows that at
times there are large quantities of water in excess of the
maximum amount of which the respondent could possibly
make beneficial use. Counsel for respondents assert that the
right of appellant to use such surplus water should be read
into the decree, but conceding such to be the case, it would
still be impossible to tell when the respondents' rights had
been satisfied under the decree, and consequently when the
appellant's rights would attach to the stream. For this rea-

son, the judgment of the trial court, even if it were supported by the evidence, could not be sustained.

Under ordinary circumstances, in equity cases, if this court is unable to agree with the trial court in its findings on the facts, we either direct what the findings shall be or make our own findings in order to make a final disposition of the case and to end the litigation. In this case there are, however, a number of reasons why we cannot finally dispose of the case.

The trial court, as appears from the record, based its findings and conclusions of law upon the theory that the respondents had acquired a prior right to the use of the water by permitting it to run onto and spread all over their lands as well as the adjoining lands, regardless of whether such lands were being irrigated or were even fit for irrigation. By recognizing that method of using water the court necessarily authorized a profligate waste as well as an unlawful use of the water as against the appellant. Respondents could not legally establish a prior right to the use of water for irrigation by merely flooding their lands and by permitting it to gather into pools on the surface or raising the water level underneath the surface in the hope of obtaining sufficient moisture to raise crops in the ensuing summer. Such a use of water in this arid region is too wasteful to be tolerated when it can be used in the ordinary way for irrigation and other domestic purposes. We have therefore been compelled to disallow respondents' claims in that regard in so far as such use may be a basis or measurement in determining the amount of water to which respondents are entitled.

By the foregoing statement we do not mean to be understood as holding that all winter use of water is necessarily prohibited as being wasteful. It may well be that respondents can beneficially use a substantial winter flow, but in such event they must use some method of irrigation by means of which the water will be confined to the lands to be irrigated and not permitted to flow over the lands as the record shows. Whether such a use can be economically made we cannot determine from the record as it now stands; nor can we

determine the acreage that can be so irrigated. That may, however, be done by hearing additional evidence and limiting it to that phase of the case. We also suggest that the measurement of the water should be made at the several points of diversion of respondents' lands and not at the dam, a long distance above the lands.

In this connection, it should also be stated that the record discloses that the respondents have some lands with reference to which they have a prior right to the use of some water for irrigation purposes, for at least a portion of the irrigating season, under the ordinary and usual method of irrigation. In view, however, that the trial court determined respondents' rights to the use of water upon the theory that they had acquired a right by merely permitting the water to flow and spread not only all over their own lands but the lands of others as well, it is impossible to determine from the record before us what the extent of respondents' legitimate rights are for the use of water by the ordinary method of irrigation; nor can we determine the quantity of land that can be irrigated by the latter method.

In view of that, the most that we can do is to set aside the court's findings of fact, conclusions of law, and decree, and remit the case so that the rights of all concerned may be determined in accordance with the views herein expressed.

Moreover, since the action was tried, the Legislature has provided a comparatively inexpensive and efficient method for determining priorities in and to the use of the waters of our public streams by having a preliminary hydrographic survey thereof made by the state engineer. A disinterested hydrographic survey of respondents' lands and irrigation systems by such state official will inevitably eliminate many of the uncertainties which are inherent in the record now before us, and will furnish a scientific guide for the trial court in determining both the extent of the respondents' requirements and the improvements which it will be necessary for them to make in their respective irrigation systems, in order to apply the water in a reasonably efficient manner.

We do not desire to be understood as directing this method,

but only as suggesting to the parties hereto what appears to be a practical solution of some of the difficulties presented in this case.

The judgment of the lower court is reversed, therefore, with directions to the district court to proceed in the manner herein indicated. Costs on appeal to be apportioned equally between appellant and respondents.

GIDEON and FRICK, JJ., and EPHRAIM HANSON, District Judge, concur.

WEBER, C. J., and THURMAN, J., did not participate herein.

CHERRY, J. (concurring). I concur in the order reversing the decree and granting a new trial. But I do not think it proper to indicate at this time that the claims of respondents to the use of water during the winter season should be disallowed entirely, or held to be inferior to the rights of appellant under its later appropriations. If respondents have any rights at all, under the evidence, such rights are superior to the rights of appellant to the winter flow of the stream. The quantities of water heretofore taken by respondents in the winter time have been grossly excessive and the manner and method of applying it on their lands wasteful and unreasonable. Such diversion and use do not constitute a valid appropriation of the quantity of water actually diverted, but I think such diversion and use, although excessive and wasteful, do form the basis for the legal right to divert and use whatever quantity of water may be found to be necessary to the use when economically applied. In other words, the claims of respondents should be subjected to the rule of necessity and economy, and within that rule be upheld.

The excessive and wasteful diversion and use of the waters in controversy occurred when there were no others claiming the right to the use of the waters, hence no one was prejudiced or injured.

The early appropriations of water in this western country

were often made in a rude and informal manner. It was but natural for the first appropriator to divert water in excess of his actual needs, and to apply it on his lands by that method which cost him the least labor and money. But his excessive diversion and wasteful use did not destroy his legal right entirely. His actual diversion and use perfected a legal right to the use of whatever quantity of water was necessary and reasonable for his purpose, when economically used. A subsequent claimant could not defeat the right—he could only insist upon the elimination of the excess and waste. The claim of the right to use water for irrigating lands in the winter time, in this climate, is unusual and extraordinary. But it cannot be said as a matter of law that such a use is not beneficial. In view of the opposing claim of appellant for storage purposes, a right for irrigation in the winter time should not be decreed, except upon clear proof of its necessity, and beneficial character. And in determining the quantity to be so used, if any is found necessary, regard must be given to the claims of others, to the end that the largest reasonable use of the whole supply may be had. It may be that the application of a reasonable quantity of water upon respondents' lands at a period previous to the growing season might be necessary and beneficial; but the claim that lands must be irrigated all winter long, in order to produce a favorable condition for growing crops the ensuing season, would be unreasonable and could not be sustained.