**UNITED STATES of America,**
**Appellant,**

v.

**AHTANUM IRRIGATION DISTRICT, a**
**corporation, et al., Appellees.**

**No. 17997.**

United States Court of Appeals
Ninth Circuit.

March 18, 1964.

898

Ramsey Clark, Asst. Atty. Gen., Roger P. Marquis, William H. Veeder, and Edmund B. Clark, Attys., Dept. of Justice, Washington, D. C., for appellant.

Palmer, Willis & McArdle, and Fred C. Palmer, Gavin, Robinson, Kendrick & Redman, and John Gavin, Yakima, Wash., for appellees.

John J. O'Connell, Atty. Gen. for the State of Washington, Charles B. Roe, Jr., Asst. Atty. Gen., and E. P. Donnelly, Special Asst. Atty. Gen., Olympia, Wash., for appellee State of Washington.

James B. Hovis, Yakima, Wash., for the amicus curiae Yakima Tribe of Indians.

Before CHAMBERS, POPE and MERRILL, Circuit Judges.

POPE, Circuit Judge.

This case is here for the second time. On the first appeal from a judgment dismissing the action which was brought by the United States against numerous individuals claiming the right to use water from Ahtanum Creek in the State of Washington this court reversed the judgment and remanded the cause for trial upon answers to be filed and issues to be made in the court below. United States v. Ahtanum Irrigation District, 9 Cir., 236 F.2d 321 (1956).

We shall not here repeat much of what was said in our earlier decision as we assume complete familiarity with it and in consequence thereof an understanding of the facts which led to the prior appeal. As there noted, Ahtanum Creek constitutes a part of the north boundary of the Yakima Indian Reservation which was created by the Treaty with the Yakima Nation of Indians, June 9, 1855, 12 Stat. 951. This court held that by reason of the rules laid down in Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340, and other decisions of this court applying the rule of the Winters case, including Conrad Inv. Co. v. United States, 9 Cir., 161 F. 829, and United States v. Walker River Co., 9 Cir., 104 F.2d 334, all of the waters of Ahtanum Creek, or so much thereof as could be beneficially used on the Indian Reservation were, by virtue of the treaty, reserved for use by the Indian tribe upon their lands.[1]

The record then before us showed that by 1915, the Indian Irrigation Service had completed the construction of irrigation canals and ditches and other works sufficient to provide irrigation water for approximately 5000 acres on the Indian Reservation. We held that as of 1915, in the ordinary course, the Indian tribe and the owners and possessors of their land would be entitled to the right to the waters of Ahtanum Creek measured by the needs of the Indian irrigation project at that date.

The main problem presented by the previous record in the case arose out of the fact that in 1908 Chief Engineer Code of the Indian Bureau executed an agreement, dated May 9, 1908, between the United States, on the one hand, and a large number of white users of water from Ahtanum Creek, who owned and were located on lands north and outside of the Indian Reservation, on the other. The terms of that agreement are set out in our former opinion where it is discussed at great length. Its main provision purported to limit and define the claim of the United States, as trustee for the Indians of the waters of Ahtanum Creek, to 25 per cent of the natural flow of the Creek, and to assign 75 per cent of the natural flow to the white landowners who were parties to and executed the said agreement. All of them purported to claim rights in and to the waters of the stream. The agreement was approved by the Secretary of the Interior.

We upheld the validity of the agreement, basing our determination in that regard upon our construction of the agreement itself, and our determination that the white landowners may have acquired some rights in the waters of the stream. Dealing with the contention of the United States that the Secretary of the Interior was without power to make such an agreement, we held that the Secretary in making it was undertaking to "deal with certain relations between

---

1. For a recent reaffirmation of the rule of the Winters case see Arizona v. California, 373 U.S. 546, 600, 83 S.Ct. 1468, 10 L.Ed.2d 542.

the Indians on the one hand and their white neighbors on the other." [2]

We went on to say: "The rights of the white settlers to the use of the waters were subordinate to the rights of the Indians, but they were not nonexistent. Until the Indians were able to make use of the waters there was no legal obstacle to the use of those waters by the white settlers. And after the Indian irrigation works were completed, there would still be the right of the non-Indian appropriators to make use of any surplus available within the stream." 236 F.2d at 335. We think this made it plain that in executing the 1908 agreement, and in determining whether there was authority to make it, the Secretary necessarily considered, as did we, that the white settlers had water rights (necessarily acquired under local law) which, while subordinate to the rights of the Indians, were still "not nonexistent".

We held that the action should not have been dismissed since the suit was one to procure an adjudication of water rights and was "in its purpose and effect one to quiet title to realty" and that it presented claims and issues which required the court to determine and adjudicate the extent of the rights of the parties with respect to the waters of the stream. Obviously those rights, so far as the Indians were concerned, arose from the provisions of the treaty, and so far as the rights of the defendants were concerned, arose under the laws of the State of Washington. We said that the defendants should have been required to appear by answer and set forth "their claims of right to the use of the waters of the stream"; we criticized the answers previously filed for not having disclosed "who these water users are, what

lands they claim and have the right to irrigate, or how they deraign their title to any water rights" and directed that on remand the court must "determine and adjudicate the respective rights of the parties, during which defendants must be required to show and disclose their rights and titles", and that appropriate answers must be required from all defendants.

We also proceeded to construe the meaning of the agreement of 1908 by way of giving directions as to the issues and questions to be determined upon remand. We shall have occasion to refer to these hereafter.

We assumed that on remand of this case the defendants would by answer set forth their claimed rights to the use of water, how those rights were deraigned, and what lands they claimed the right to irrigate; it was plain that the only water rights which the court would be required to measure and ascertain would be the water rights of the specific individuals who entered into the 1908 agreement. As we said, that agreement was not made between Engineer Code and all citizens of the State of Washington—it was made with specified individuals—and that their right to the use of 75 per cent of the waters must have been limited to their need as of 1908.

At the trial below the defendants proceeded initially to conform to the directions given by the court. They filed numerous answers setting forth, as we had directed, "who these water users are, the lands they claim to have the right to irrigate, and how they deraigned their titles to any water rights," and generally set forth their claims to water rights in the stream as to the various dates of acquisition.[3]

2. We said: "The management of any parcel of land necessarily involves some degree of occasional adjustment of the rights of the owner in relation to and concerning adjoining landowners; arrangements for the location and erection of boundary fences, and repair and maintenance of those fences are illustrations of this. More specifically we have here the case of a stream which formed the boundary

between the Indian reservation and the outside public lands, and which public lands were open to entry by white settlers." 236 F.2d at 335.

3. For instance, the answer of the defendant Kenneth P. Bates and wife set forth the land which they owned, by legal description; it stated that they had deraigned title thereto from Catherine

To support the allegations of these answers the defendants called numerous witnesses who testified respecting the use of the waters of Ahtanum Creek upon the various tracts of land involved as of the year 1908, when the agreement was executed.[4] These were witnesses who were familiar with the land in question and Ahtanum Creek in the years 1907–1908—generally neighbors residing in the vicinity of the property at that time and who testified that they knew about the irrigation of the lands set forth in the answers.[5]

Although a very substantial amount of similar testimony was offered with respect to the lands owned or claimed by the various defendants, and although the trial court found which lands were actually using water in 1908, the acreage irrigated on each parcel, and the duty of water, it made no formal conclusions as to the extent or validity of the water rights of defendants or their predecessors as of 1908. While there was no testimony as to the dates when water was initially diverted for these lands, the conclusion seems plain that if these lands were, as found, actually being irrigated in 1908, their owners then had acquired water rights, subject, of course, to the rights of the Indians.

On remand the case was referred to a special master who made a report and recommended findings which in general were approved and accepted by the trial court. The master made no determination as to water rights as such, or as to the existence or validity of such rights under the Washington law, whether based on appropriation or by virtue of riparian location.

■ It appears that the master, disregarding our prior admonition that the water rights of these owners claimed as of 1908 must be set up in the answer and determined by the court, was unduly impressed by the language which we used to the effect that these water rights are necessarily limited by the *needs* of the owners as of 1908. In no manner did our former opinion state that the rights of the defendants were as great as their needs for water. Our reference to needs was a reference to a *limitation* upon the extent of the water rights.

Obviously we contemplated that in each case the defendant must establish that he had a right for a stated quantity or amount of water; that he must estab-

---

Lynch who was a signer of the agreement of 1908; they claimed for the irrigation of such land 146 inches of the waters of Ahtanum Creek alleged to have priority of use as of 1866; and that prior to the year 1908, and at all times since, the said premises were all being irrigated, were susceptible of irrigation, and could beneficially use the quantity of water mentioned when available from the flow of the Ahtanum Creek.

4. This type of proof was appropriate in view of our previous decision to the effect that "the right to the use of 75 per cent of the waters must have been limited to the needs as of 1908 of the particular individuals who were parties to the agreement;" and also, that "their interest as of 1908 were necessarily limited to their then interest and the subsequent uses or ownerships could not enlarge their rights under the arrangement for the division of these waters."

5. Thus, in support of the allegations of the Bates' answer (note 2, supra), two witnesses were called, each one testifying with respect to one of the two parcels described in that answer. Witness Hatton testified that he was acquainted with parcel one, there described, in 1907–1908; he had been a neighbor, owning land a half mile distant; he had observed the Bates parcel in 1907–1908, and was familiar with the crops growing thereon; it was hay and grain and "there was lots of brush on the place, lots of waste land;" it got its water from Ahtanum Creek through open ditches; he could not state whether there was any alfalfa growing there; he remembered the acres under irrigation in 1907–1908 as 40 acres; he testified that more land on that property was irrigated at the present time than in 1907–1908.

Similarly witness Spon testified as to Bates parcel No. 2. He had been a neighbor; he knew that that parcel was irrigated in 1907–1908; hay and grain were the crops; the water came from Ahtanum Creek, and he remembered that the number of acres then irrigated was 40 acres; he did not know about the irrigation there after 1918.

ish how he acquired it; and that this in turn could not exceed his needs. The report accompanying the master's proposed findings discloses his misapprehension of our holding. Thus the report states: "This conclusion refers to *need*, of course; it is not believed there was enough water in the creek to supply this much water per acre in the low water period of 1908."

Rejecting the proposition that the quantity of water actually being used by the defendants or their purchasers in 1908 was important, the master said: "Plaintiff's view, that the needs of the north side parties to the 1908 Agreement, mean the quantity of water actually being applied by them at that time to a beneficial use, is not persuasive. Need and use are not the same things. It would be possible for water users to *need* far more water than they *used* in a particular period. If the 1908 *use* determined the north side's 1908 *need,* the quantity of snow which fell in the mountains the preceding winter would determine the farmer's need for water; and if a drought had occurred that year, it would mean the north side farmers needed little water (since, having little available, they would have used little). The amount of water actually put to a beneficial use in the face of abundant water supplies, could well be an accurate indication of need. Since the Ahtanum Valley does not have abundant water supplies, the suggested test is not valid." (The emphasis is that of the master.)

We think it is apparent that the master may have been misled by his own misinterpretation of the import and significance of the 1908 agreement. His report analyzed the 1908 agreement in the following manner: "It is believed that an analysis completely independent of the Court of Appeals' opinion, would result in the same conclusion—that the Agreement of 1908 constitutes an effective con-

veyance of the rights to 75% of the waters of Ahtanum Creek (both natural and return flow)." [6]

This conclusion of the master that the agreement of 1908 operated as an instrument of conveyance whereby certain waters held by the United States in trust for the Indian tribe were conveyed to the other parties to the agreement, was rejected by the district judge when the master's report came up before him on exceptions thereto. The judge held that the agreement was neither a conveyance nor a contract to convey an interest in the water rights of Ahtanum Creek, saying: "In my opinion, the most reasonable characterization to be placed upon the 1908 agreement is that it was an agreement whereby the parties settled a dispute as to their respective water rights in the creek and as such is similar in legal effect to the well known 'boundary line agreement'. Bree v. Wheeler [4 Cal.App. 109], 87 Pac. 255 (Cal.1906). This conclusion is based upon a consideration of case authority dealing with this issue, the agreement itself, and the known objectives the parties were attempting to accomplish by entering into this agreement. An agreement of this type, favored in the law as it operates to settle disputes, does not convey title to either party but merely establishes their respective rights."

In thus disagreeing with the master's version of the 1908 agreement the judge was eminently correct. The most difficult question presented to us on the former hearing was whether it could be said that the Secretary had power or authority to approve the 1908 agreement. The opinion itself adequately discloses the laborious manner in which we were obliged to deal with that question. We finally concluded that because of the general powers of supervision and management vested in the Secretary he could approve that agreement as one designed to make a

---

6. He proceeded to recite that questions concerning real property are governed by the law of the state; that under the law of Washington the deed does not have to follow a specific statutory form but that the 1908 agreement contained words of grant "granting and conceding" to the party "all rights heretofore claimed"; and said: "This holding clearly imports a grant, a transfer of rights."

peaceful arrangement for a practical mode of use of the waters of the stream. We compared the type of arrangement there involved with other types generally involving some degree of occasional adjustment of rights of the owner in relation to an adjacent landowner and mentioned arrangements for the location and erection of boundary fences.[7]

As our original opinion shows, our finding that the Secretary had these powers of management was in turn based upon another premise which was that at the time in question the white settlers had some water rights which, although subordinate to the rights of the Indians, "were not nonexistent". In short, our conclusion that the Secretary had this power was predicated upon our holding that the white settlers might in fact have water rights in and to the stream.[8]

We are not now called upon to express any opinion upon a purely hypothetical problem, but it must be plain from our original opinion that if we have been called upon to uphold the power of the Secretary of the Interior to make a conveyance of the waters of Ahtanum Creek to these white landowners we would have been confronted with a very serious question indeed—a much more difficult question than that which we decided.

The master's erroneous assumption that the 1908 agreement amounted to a conveyance of 75 per cent of the waters of the Ahtanum Creek to the white settlers who were parties thereto led to his adoption of a solution which was wholly beyond the contemplation of our original decision. It produced for the master's report a deceptively simple result. With his misconstruction of our references to "needs" of the various water right owners he came to the conclusion that roughly speaking what the Government had done was to turn over, *en masse* and in gross, this 75 per cent of all these waters,

unrelated to any particular parcel of land, and unrelated to proof of water rights under Washington law, with the assumption that if it could be proven that present owners of the lands owned by the signatories to the agreement need all that water and if the owners had need of all that water in 1908, they could have it all.

Of course in a broad sense any land in an arid area such as the Ahtanum valley needs all the water it can get and use beneficially. The master found that in 1908, 5718 acres constituting portions of defendants' properties were under irrigation, and that in 1957 there were 5801 acres under irrigation. He also found that the duty of water for supplying these lands was ½ miner's inch per acre during the irrigation season. Calculating the irrigation season as extending from the first of May through the last of October, 184 days, and computing 50 inches of water as the equivalent of a second foot, he calculated the amount which would be diverted by such a continuous flow of ½ inch to the acre as producing 3.7 acre feet per acre in the year 1908. Converting the ½ miner's inch per acre to cubic feet per second he found that "1908 total allowable diversion requirements, based upon established acreage of 5718 acres, is 57.18 cubic feet per second." Pressing his theory as to the significance of the "needs" of the defendants, the master found that these allowable diversion requirements were actually less than the existing needs of the defendants.

As we have noted, although the district judge disagreed with the master's basic premise that the 1908 agreement amounted to a conveyance to the parties to that agreement of 75 per cent of all the waters of Ahtanum Creek, he nevertheless adopted the findings and conclusions of the master without noting that the mas-

7. The Government criticizes the district judge's reference to a "boundary line agreement" on the ground that no boundary was involved here. When we referred to boundary fences we did so only by way of analogy and undoubtedly that is what the district judge had in mind when referring to a boundary agreement.

8. In 1908, of course, the Indian Bureau was diverting a very limited amount of these waters as the main diversion system was not completed until 1915.

ter had completely misconstrued the import of our original decision. The judge, like the master, failed to make any determination as to the extent and limitation upon the water rights of the defendants in the waters of Ahtanum Creek under Washington law as of the year 1908.

The result of the master's findings, as adopted by the court, is a determination that by and through the 1908 agreement, the United States, as trustee for the Indians, handed over to the white settler parties to that agreement a flat 75 per cent of the stream flow but subject to the implied limitation that this referred only to the rights existing as of 1908 and as limited by the needs under those water rights. Nowhere in this record is there a determination as to the extent of the water rights of those parties to the 1908 agreement.

Under the theory of the master and of the trial court, the primary inquiry was whether these landowners needed certain amounts of water; and concluding that they needed the full 75 per cent of the natural flow of the stream, the court awarded them that amount, subject only to the limitation that their use could not exceed one half inch to the acre, or 57.18 second feet for their entire acreage. We have noted heretofore that the master was not interested in making an inquiry as to how much water these parties actually used for he was careful to note that "need and use are not the same things" and his report stated, as indicated above, "This conclusion refers to *need*, of course; it is not believed there was enough water in the Creek to supply this much water per acre in low water period of 1908. If the supply had been there, however, this much water could have been used, and would have been needed."

■ The master's findings obviously related to a hypothetical situation; and the conclusion is irresistible that the master arrived at his conclusions as to needs in 1908 by assuming that they were the same needs then as the needs in 1957. We shall note shortly that under Washington law the water right of any kind, whether appropriative or riparian, cannot be ascertained apart from an inquiry as to the use made of water by the claimant thereto.

■■ The record does however contain a substantial amount of evidence from which, on the basis of the findings made, we can determine the extent and character of the water rights of the parties to the 1908 agreement in that year. In judging as to the effect of this evidence we must bear in mind the law of Washington relating to water rights. It is plain that under Washington law water rights could be acquired either by appropriation or by virtue of ownership of riparian lands. To perfect an appropriation under the rules applicable in most western states, including the State of Washington, the user must apply the water to a beneficial use with intent to appropriate. The beneficial use is the test and the measure of an appropriative right. As stated by the Supreme Court of Washington: "An appropriation of water consists of an intention to appropriate followed by a reasonable diligence in applying the water to a beneficial use." In re Alpowa Creek, 129 Wash. 9, 13, 224 P. 29, 31.

■ For the purpose of our decision it is of no consequence whether the rights which are for adjudication here are appropriative rights or riparian rights. The settled law in the State of Washington is that riparian rights, their existence and continuation, are, like appropriative rights, dependent upon beneficial use. Departing somewhat from its earlier decisions, the Supreme Court of Washington in 1923, in the case of Brown v. Chase, 125 Wash. 542, 553, 217 P. 23, 26, said: " * * * we are now prepared to declare, instead of the mere loose and general expressions in some of our opinions, that: (1) Waters of nonnavigable streams in excess of the amount which can be beneficially used, either directly or prospectively, within a reasonable time, on or in connection with riparian lands, are subject to appropriation for use on nonriparian lands."

Although the Brown v. Chase decision came later than the year 1908, with

which year we are primarily interested here, the determination as to the rights of riparian proprietors in that case was a declaration not of new law created by statute, but of pre-existing law in the State of Washington. The rule of the case has been followed consistently. In 1925, in State v. American Fruit Growers, 135 Wash. 156, 161, 237 P. 498, 499, the court, after citing and quoting from Brown v. Chase, said: "In other words, the riparian owner, before he has any rights to protect, must with reasonable certainty show that either at present or within the near future he will make use of the water for irrigation purposes." [9] The Washington Supreme Court has defined "reasonable time" to mean "say two or three years." State ex rel. Liberty Lake Irr. Co. v. Superior Court, 47 Wash. 310, 314, 91 P. 968.

It would appear that until the master evolved his erroneous theory the defendants were not in doubt that this court had previously ruled that they must prove their rights as of 1908 and establish their needs to the water as of that time. Thus, in their petition for certiorari following our former decision, defendants stated: "We thus find the court upholding the agreement on the one hand and then requiring the water users on the north side to completely readjudicate their rights by requiring them to establish their

needs as measured fifty years ago. * * * The Court of Appeals' decision states: 'Furthermore, as in the case of other suits to quiet title, the defendants should have been required to appear by answer and set forth their claims or right to the use of the waters of the stream.' The effect is to require the Ahtanum water users to adjudicate again their right to the use of waters from the stream. They are not only required to establish their needs as of 1908, which was one of the purposes of the 1908 agreement, but are again required to prove their water rights with the same particularity which was required of them in the state court proceeding in 1925."

Plainly with this correct understanding of the meaning of our mandate the defendants at the trial on the remand proceeded to prove, elaborately and with particularity, what their water rights, or the water rights of their predecessors, were in 1908. In general, the proof that was received followed the allegations of separate answers filed. Testimony was given as to the number of acres or areas irrigated in or about 1908 on each parcel of ground. Those who testified in this respect, a substantial number of witnesses, were in their 60's, 70's or 80's. A reading of the cold record seems to indicate that they had reasonably clear recollections of what was going on in the

9. As recently as 1956, Brown v. Chase was approved in Snively v. Jaber, 48 Wash.2d 815, 820, 296 P.2d 1015, 57 A.L.R.2d 560, quoting from Proctor v. Sim, 134 Wash. 606, 236 P. 114, where the court was urged to abandon the doctrine of Brown v. Chase and it expressly declined to do so. This court in California-Oregon Power Co. v. Beaver Portland Cement Co., 9 Cir., 73 F.2d 555, 564, aff'd, 295 U.S. 142, 55 S.Ct. 725, 79 L.Ed. 1356, had occasion to call attention to Brown v. Chase and state its rule that a riparian owner in Washington was not entitled .to the undiminished flow of a stream, "if that flow was not of substantial benefit to him."

Two authorities writing in the Washington Law Review suggest that the Washington rule is that a riparian's water rights may be lost or destroyed by non-user. See Horowitz, "Riparian and Appropriation Rights to the Use of Water

in Washington," 7 Wash.L.Rev. 197, 212: It has been said that Brown v. Chase made it " * * * possible to argue that whereas the appropriator *gained* his right to the use of water by diligently and beneficially using the same, the riparian owner *retained* his right to the use of water by diligently and beneficially using the same." See also Morris, "Washington Water Rights—A Sketch," 31 Wash.L. Rev. 243, 249: "In this state however, non-user directly and prospectively, does work a forfeiture of the riparian right to use water for irrigation purposes." The author cites State v. American Fruit Growers, 135 Wash. 156, 237 P. 498, in support of this statement.

We are presented with no problem of forfeiture by .non-user in this case. The authorities mentioned are cited for their demonstration that a riparian right is dependent upon beneficial use.

Ahtanum Valley 50 years prior to the time they were testifying. Although, as we have indicated, the master's view of the case was such that he deemed it unnecessary to make findings as to the water rights of the then owners of these particular tracts, he did accept, practically in toto, the testimony of these witnesses as to the number of acres then irrigated on these several parcels. We have noted a few and rather unimportant respects in which the master made mistakes as to the area irrigated, to which we shall refer later in this opinion; notwithstanding these we necessarily accept in general his findings as to the acreage irrigated, findings which were approved by the trial judge.

The master's determination of the acres irrigated appears to be quite generous. This may have been due to the fact that the view which he took of the case was such that actual beneficial use of water by certain individuals in 1908 was not important.[10]

The testimony revealed without conflict a very definite picture of the farming and irrigation practices in Ahtanum Valley and in the areas here involved in 1908. At that time the area was much more sparsely settled—as one witness put it at the time of the trial, there were ten times the people then resident there in 1908. The agricultural industry in 1908 was built upon and tied to the raising of livestock. The nearby forest reserves and other available ranges in the adjoining mountains provided pasture for the ranchers' cattle; after the cattle were brought out of the hills in October, they were fed through the winter with the hay harvested early in the summer on these lands and with grain, mainly barley, grown there also. In the early months of May and June, when the heavy run-off was appearing in the Ahtanum, the lands were irrigated and the hay and grain crops made. The hay and grain were cut and harvested by the first of, or early in, July. The hay in the main was wild hay or timothy, although in 1908 some alfalfa had been seeded in a few places.

Because of this type of farming the system of irrigation which developed on the lands outside of the Indian Reservation in the Ahtanum Valley adequately met and fulfilled these needs. This method of farming was largely the result of the fact that by the first of July each year, generally speaking, the supply of water had greatly diminished so that because of the porous condition of the bed of Ahtanum Creek, the water flowing therein sank out of sight. Thus one witness for the defendants who had testified with respect to a number of parcels of land there, one of which he owned in 1908, testified as follows: "Early in the year, I irrigated, but later in the year I did not because you had no water." Describing the land he said: "A. You could raise good crops on it if you had the water. Q. But you did not have water? A. After July. Q. After July what, first? A. The first part of July."[11]

---

10. The testimony and other evidence discloses that substantial portions of the lands found irrigated and irrigable were alkali flats sustaining only salt grass. (And see particularly a 1907 map, Exhibit 87.) Witnesses insisted these areas were irrigable and the master accepted their assertions, improbable as they seem.

11. The witness also testified: "Q. (By Mr. Veeder) Now, your uses, then of water and in that area generally, your uses and your neighbors' uses, were geared to the available supply of water ending about July 1st, is that right? A. Yes. Q. In other words, your whole economy was based upon a shortage of water after July 1st? A. Yes. Q. So you had no late water at all down there, that is, late in the irrigation season? A. As far as irrigating is concerned, we didn't no."

Another principal witness for the defendant, one who testified at length with respect to many of the defendants' lands, explained that in 1908 the whole economy in the area was such that the people raised mostly livestock and dairy cows; the livestock was pastured in the summer on the forest reserve; the ranchers cut timothy and wild hay for winter feed, and after they cut the hay they stacked it

In those days there were no irrigation diversion works or other structures. When the ranchers wanted water they simply carried it away from the creek. The stream banks "were cut whenever they seen fit." They would flood the water across the natural pasture and the grass would grow and then when the fields dried out after the first of July, the hay was cut. That was the backbone of the livestock industry. Some small amount of alfalfa had been introduced in the area by 1908. This witness was able to list only one tract of 40 acres of alfalfa

that she knew of in 1908. There is no showing that the ranchers procured more than one cutting of alfalfa.[12]

We have here listed a fair sample of all the testimony given as to the conditions of farming and irrigation in 1908. If the first of the alfalfa was cut about the first of July in those places where alfalfa was found, there is no evidence that a second crop could be irrigated or produced with the available water.[13]

An examination of the testimony of the witnesses on whom the defendants

and held it for winter feeding. The cattle were brought in about October. He said that basically and fundamentally "their whole economy was geared to an early irrigation season use of water." "The whole farming and ranching operation was based on an early spring, a high run-off, and a lot of wild hay and timothy." The crops raised were "hay and grain, mostly hay." The witness testified that after July 15, he was out of water because "it would sink above my ditch." This witness testified that the practice in the area was to harvest the grain around the first to the 15th of July "along about the 10th, 15th, something like that;" that the landowners would "have to quit irrigating some ten days before they harvested because they could not harvest from a wet field,"—"the binder would get stuck".

Another principal witness, who described the irrigation on numerous tracts, and who herself had been an owner in 1908, testified as to certain tracts which raised hay, grain, and had pasture for range cattle. She testified that as to the area generally, it was "a livestock industry depending upon this wild hay until we started with alfalfa;" that the hay was raised mainly for feeding of stock. As to the great increase of population in the area since 1908 she said, "We got ten to one now." Testifying specifically with respect to one piece of property, she said: "The water goes down in the summer so that there is no water in the later part of the summer; that is from the first of July; but in the spring they irrigate the entire place." With respect to her own property she said: "As a rule we haven't got no water down in that district too much after the first of July."

12. One such witness testified that if the first crop of alfalfa could be cut by the 20th of June it would be possible to irrigate the land sufficient to cut a second crop.

13. There is some evidence that there were hops grown in the valley in some small tracts, but there is no evidence that late water was available for irrigation of hops. There is testimony by those who raised hops that water for them was procured from other sources. One witness who testified that the available water for his irrigation was the same at the present time as it was in 1908, said that his water was shut off around July 1st, and that "when they shut us off we pumped." The witness raised hops; he also had a spring and a swamp which he drained and which was not Ahtanum water.

Another witness who raised hops had springs on his property from which he irrigated. "When the creek got low we would take water from where we could get it. Then the springs and any place else." A perusal of this witness's testimony, direct and cross, is interesting because of his obvious effort to make it clear that water was often not available. Asked what work he did in the Ahtanum Valley he replied: "Irrigated, tried to, when we had water." Asked what crops were grown he listed among those crops timothy hay," where they could get, you know, where there was enough water." Asked whether certain property had been irrigated continuously from 1907–8 to the present time, he answered, "Yes, when there was water." He said "sometimes there wasn't any water in the creek," and that then he would take water from the springs.

Another witness who formerly raised hops on his land testified that he stopped that practice for several reasons. One was the low price, and another reason was, "We used to buy water from the fellows who had the wells and it got too expensive for them to buy water for the hops so they pulled them out."

relied for proof of their use, or of their predecessor's use, of water for irrigation in 1908, discloses a complete unanimity as to the fact that water for irrigation was generally not available after the first of July each year; that the methods of farming then used had been adapted to that circumstance through the raising of crops which would mature or could be made through irrigation up to the first of July and that in general their type of farming was such that they did not require or need irrigation after the first of July.

■ This evidence and the record made with respect to the water rights of the defendants and the use of water by defendants in 1908 compels a conclusion that their water rights were limited in time. Applicable here is the rule universally recognized as a part of the law of waters in the western states that a water right may be measured by time as well as by volume. This principle is well stated in Hardy v. Beaver County Irrigation Company, 65 Utah 28, 40, 234 P. 524, as follows: "It is elementary that an appropriation of water is limited by time as well as by amount; in other words, that an appropriator's right is limited by the quantity of water which he has beneficially used and the seasonal period during which he has used the same. [Citations omitted.] And in the case at bar the respondents' appropriations must be limited to the amount of

water they can use beneficially during the period of the year when they have actually been accustomed to use the same." (The court in that case, dealing with respondents' rights to the use of the waters of a stream, noted that "the record shows conclusively that they did not use any water after subsidence of the flood flow in June * * *.")

Another case which involved facts and circumstances strikingly similar to those present here is McPhee v. Kelsey, 44 Or. 193, 198, 74 P. 401, 403. The court there said: "Defendant's original appropriation of water from North Powder river and the enlarged appropriation therefrom and that from Hutchinson Slough were for domestic, stock, and irrigating purposes; that is, for the irrigation of timothy and wild grasses used for making hay, and crops of cereals, such as wheat, oats, barley, and the like. Water was required for such irrigation as late as the early part of July after which time no use was made of it except such as was needed by the parties concerned for domestic and stock purposes, which was inconsiderable as compared with the whole. Such is, therefore, the measure of the original appropriation * * *." [14]

■ Other cases recognizing and applying the same principle, to the effect that a right to use water does not extend beyond the period in which it has been beneficially used, are numerous.[15]

---

14. The case before us does not involve any problem of use of water for domestic or stock purposes. There is no evidence of use or need for stock or domestic water in 1908. It is noted that the 1908 agreement recites that it is made for the purpose of settling the rights of the parties to make diversions for irrigation purposes. "That whereas the parties hereto claim certain quantities of water in the Ahtanum Creek, County of Yakima, State of Washington, and a right to divert the same for irrigation purposes. * * *"

15. Clough v. Wing, 2 Ariz. 371, 378, 17 P. 453, 455 (1888), quoting from Barnes v. Sabron, 10 Nev. 217, the court said: " 'In other words, if plaintiff only appropriated the water during certain days in

the week, or during a certain number of days in a month, then defendants would be entitled to its use in the other days of the week or the other days in the month.' "

Santa Paula Waterworks v. Peralta, 113 Cal. 38, 44, 45 P. 168, 170 (1896). The trial court awarded the defendant "use of the water for irrigation to twenty-four hours of each week commencing on the afternoon of Saturday;" held on appeal, "[H]e having ceased to use the water at other times, the plaintiffs might lawfully take it at those times."

Cache La Poudre Reservoir Co. v. Water Supply & Storage Co., 25 Colo. 161, 53 P. 331, 46 L.R.A. 175 (1898): "* * * [T]here is no difference in principle between 'an appropriation meas-

The principle here referred to has been noted by the text writers on water law as applied in the western states. Thus, Mr. Kinney, (2 Kinney, Irrigation and Water Rights § 786 (2d ed. 1912)), using the language found in Smith v. O'Hara, 43 Cal. 371, 376, said: " * * * there is no difference in principle between appropriations measured by time and those measured by volume." [16]

It seems fair to say that the nature and extent of the water rights of the contracting white landowners as of 1908 must have been within the contemplation of the parties when the 1908 agreement was executed. Those white landowners, as the record shows, were using waters of Ahtanum Creek for the production of their crops, principally wild hay and timothy, and for their grain, principally barley, which were to be used for feed for their livestock. This was the limit of the then needs of these contracting parties.

At that time, as the evidence shows, there was a complete absence of diversion works, measuring devices or other controls for use of the water. When the farmers wanted water they merely opened up a ditch with a plow or turned the water into high water channels and pro-

ceeded to flood their lands. Once the crops had been made and were ready for cutting early in July, their needs had terminated. As we said in our earlier decision, "their interest as of 1908 were necessarily limited to their then needs, and subsequent uses or ownerships could not enlarge their rights under the arrangement for the division of these waters." (236 F.2d at 340)

The master and the court, upon the basis of the evidence before them, have found that the duty of water appropriately applied here is one-half inch to the acre, or one second foot for each one hundred acres. The master ascertained and found the tracts of land actually irrigated and the irrigated acreage of such tracts; and we accept those findings (except for certain apparent errors hereafter mentioned). The only matter remaining therefore for determination here is the extent of the period during which the needs of those owners as of 1908 continued and the period during which they actually used water for irrigation. Applicable here is the rule stated in Hardy v. Beaver County Irr. Co., supra, that "it is equally incumbent upon claimants in actions of this kind to prove the extent of their appropriations both in time and amount with the

ured by quantity and an appropriation measured by time.' Kin.Irr. § 177 et seq. * * *." 53 P. at 333.

Uhrig v. Coffin, 72 Idaho 271, 240 P.2d 480, 482 (1952). " * * * '[T]here is no difference in principle between "an appropriation measured by quantity and an appropriation measured by time." ' "

Galiger v. McNulty, 80 Mont. 339, 354, 260 P. 401, 404 (1927): " 'There is no difference in principle between appropriations of waters measured by time and those measured by volume.' * * *"

16. The same statement is often found in the decisions. See cases cited in note 16, supra.

See Hutchins, "Selected Problems in the Law of Water Rights in the West", pp. 299–300 (1942): "The appropriative right commonly relates to a period during which water may be diverted for use. One may be entitled to divert a given quantity continuously throughout the year, or only at intervals. * * * The principle is logical, for one perfects an appropriative

right only to the extent of actual application of water to beneficial use; the flow during other seasons or periods, in which there was no attempt or intent to divert the available flow has not been applied to beneficial use by this particular appropriator and there is unappropriated water so far as he is concerned."

See also, Long, Irrigation § 137 (2d ed. 1916): "As we have already seen, a prior appropriator of water acquires an absolute right thereto only to the extent to which such water is applied to beneficial use. His right to the water depends upon user, and can exist or continue only at or during such times as the water is used or needed for a beneficial purpose. If, therefore, the prior appropriator makes use of the water only at certain times, as during certain seasons, or on certain days in the week, or during a certain number of days in a month, other persons may acquire a right to the use of the water at other times, or on other days."

same degree of certainty." 234 P. at 528.

In the light of the unanimity of the evidence upon the subject, we are compelled to hold that the water rights of the individual parties to the 1908 agreement, which were contemplated thereby, terminated in the early part of July in each year, a conclusion which must be reflected in the final judgment in this case.[17] This unanimity of the evidence greatly simplifies the solution of this case. If it appeared that on one parcel water was needed and actually used for a materially larger period than on another, the court would necessarily have to make separate findings as to each individual parcel affected. As we note hereafter, the trial court chose to deal with the division of the water as to the defendants "in the aggregate." Such would not be feasible were it not plain that the periods of use by all defendants were substantially the same.

The appellant has specified error as follows: "In failing to determine the actual beneficial use made of the waters by individual defendants in 1908 or at the present time." This specification relates to the court's third conclusion of law as follows: "That this water rights adjudication under the issues as presented herein is restricted to a determination of plaintiff's rights to the waters of Ahtanum Creek, as originally reserved under the Treaty of 1855, so far as they were retained by the agreement of 1908, and a determination of defendants' rights, collectively, so far as they were fixed under said agreement. That

these rights, under the terms of said agreement, are to be ascertained by measurement and by a percentage division in the aggregate, of Ahtanum Creek waters as provided therein without an adjudication of waters to or for any particular tract of land." It is argued that that conclusion is not in accord with the directions contained in our original opinion.

■ There, in noting the insufficiency of the answer originally filed by the irrigation district, we said that the answer "is wholly uninformative as to who these waters users are, what lands they claim to have the right to irrigate, or how they deraign their titles to any water rights." 236 F.2d at 339. We also said (Ibid.): "Since the cause must be remanded for further proceedings in the trial court, and since those proceedings must determine and adjudicate the respective rights of the parties, during which defendants must be required to show and disclose their rights and titles, it is apparent that proper and appropriate answers must be required from all defendants." We think we made it clear that it was necessary for the defendants and each of them to set out and show what their water rights were, the lands they claimed the right to irrigate, and how they deraigned their titles.

Appellant particularly complains of the district court's adjudication of the rights of the defendants "in gross" or "in the aggregate", as stated in the Conclusion No. 3 previously quoted; and asserts that this treatment of the rights of the defendants as a group, or in the

17. The termination of that period is described by the various witnesses in substantially the same language. One witness said: "From the 1st of July", and also describing the available water, said there was not "too much after the first of July." Others used such expressions as "around the first of July," and "along about the first of July." It is to be noted that the significant testimony in this case, to which we have referred, relates to the use of and availability of water in the year 1908. We know that in 1908 the principal diversion canal on the Indian lands on the opposite side of the

Creek had not been constructed. Extensive use of the water for the Indian land did not commence until that ditch was completed some time between the years 1911–1915. There is no evidence in the record as to how much water was being used for the Indian land for 1908. Since uses there were not extensive at that time, it may well be that the supply of water flowing out of Ahtanum Creek, out of which the defendants were making their diversions, at that time included at least some part of the Indians' 25 per cent of those waters.

aggregate, is error for several reasons. In the first place it asserts that this treatment is in violation of the directions made by this court in the portion of the opinion above quoted. Also alluded to is our statement that "their needs as of 1908 were necessarily limited to their then needs, and subsequent uses or ownerships could not enlarge under the arrangement for the division of these waters." We had also said that "It must be understood that the right to the use of 75 per cent of the waters must have been limited to the needs as of 1908 of particular individuals who were parties to the agreement." Appellant asserts that these directions cannot be implemented unless the court adjudicates the water rights of each individual defendant separately and individually.

Appellant argues that, if the in gross treatment is permitted, then if the needs of a particular tract of land lessened, or the use of the water there is abandoned, some other white owner would be able to enlarge his use. Hereafter, in this opinion, we take into account the findings of the district court which disclose that as to some of the parcels of land owned by defendants, the use of water thereon diminished after 1908 so that the irrigated acreage in 1957 was less than that found to have existed in 1908. We then shall take appropriate action with respect to that circumstance. We recognize that the same diminution of use may take place hereafter, and that in some instances there may in fact be an abandonment of some water rights. The record shows that since 1908 some of these lands have been used for town sites, for polo grounds, and airports, uses which would eliminate any need for further irrigation—that process may continue hereafter.

 But, as we shall note shortly, the court, in deciding upon this in gross treatment, had other considerations in mind, which prompted this exercise of its discretion. The whole problem is not a simple one. Clearly in some cases, a user who decides to give up farming on his land may, under Washington law, sell his water right to another. The consequences of a diminished use, or an abandonment, mentioned by appellant, must be weighed against the court's assigned reasons for not undertaking a tract by tract adjudication. We think the adverse effects suggested by appellant can be guarded against if the court reserves jurisdiction, as it may properly do, to modify its decree at a later time, should changed conditions so require.

We recognize that it would have been entirely in accord with the directions indicated in our former opinion for the court in its decree here to adjudicate the water rights of particular tracts separately and individually. However, there are other considerations which we think warrant the district court in exercising its discretion not to extend its decree so far. After all, the primary purpose of the plaintiff's suit was to procure an adjudication which would protect the rights of the Indians and of the Government, as trustee for them, as against claims of the defendants. The Government cannot be interested in a general adjudication as to the relative rights, among themselves, of the various defendants. It would not be interested in their respective priorities. As stated in Virginian Ry. v. Federation, 300 U.S. 515, 551, 57 S.Ct. 592, 601, 81 L.Ed. 789: " * * * the extent to which equity will go to give relief where there is no adequate remedy at law is not a matter of fixed rule. It rests rather in the sound discretion of the court."

One matter properly to be considered in the exercise of this discretion is the fact that the State of Washington had established through its Water Code, adopted in 1917, an elaborate system for adjudicating, controlling, and administering generally, water rights acquired under state law. Rev.Code of Wash., Ch. 90.03. This Water Code sets up a system for the establishment of water masters operating under a supervisor of water resources who keep track of rights and priorities, open and close headgates, and divide and regulate the use of water. A federal district court is not necessarily

possessed of any better machinery; and we think it was within the discretion of the court below to limit the scope of its decree so as to avoid its having to assume distribution and control functions which it is in no position to exercise. As we have noted, the district court has the power to reserve the right hereafter to make any appropriate order or modification of its decree required to meet such changing conditions as may hereafter develop touching and affecting the appropriate protection of the rights of the appellant.[18]

Notwithstanding the generalizations contained in Conclusion No. 3, quoted above, the findings do set out in detail the names of the various parties defendant, referring to the numbered answers filed with a description of lands on which the right to use water is claimed, and a statement of the number of acres irrigated in 1908 on each parcel described. In the light of those findings we perceive no difficulty in drawing the proper conclusion that as of 1908 the owners of those particular parcels thus described in the findings were making use of the waters of Ahtanum Creek to irrigate the irrigable area there found, and that accordingly the several owners of those tracts had the right, as of 1908, to water for irrigation for the areas there determined.

Appellant complains that the court refused to adjudicate the 1908 claims of some 456 defendants who failed to establish beneficial use of water or the existence of water rights belonging to them or to their predecessors in interest as of that date. However, the findings of the court do disclose, as we have indicated, the lands which were in fact irrigated in 1908, and the acreage in each parcel that was so irrigated. Obviously this finding purports to be and is a determination as to the entire use of waters in 1908. By excluding therefrom other tracts, the finding, it seems to us, adequately disposes of any claims that might have been made by other persons in respect to lands not listed in the findings.

Appellant argues at considerable length that the trial court's findings with respect to the claimed waste of water are clearly erroneous and that the evidence calls for more specific findings of actual waste, both in 1908, and as of the time of the trial of the case in the court below.

At the trial before the master, the appellant undertook to show that the defendants' use of the waters of Ahtanum Creek involved great waste of those waters. It was shown that some of the defendants used meandering high water channels to carry water to their lands; that these channels were across porous gravelly soil, not puddled as a properly constructed irrigation ditch would have been, and that excessive loss of water occurred not only in diversion ditches but upon the lands themselves. The master found that there was no evidence of undue or unreasonable waste of water and his findings were adopted and approved by the trial judge.

In our former opinion we noted this claim of the United States, that it would be a matter appropriate for consideration and determination on retrial of the cause, and noted that if waste could not otherwise be prevented the court might restrain the party from using water until

---

18. Authorities illustrative of the proposition that a court of equity may fashion its decree so as to avoid undue continuous administration and supervision of the carrying out of the decree are Marble Company v. Ripley, 77 U.S. (10 Wall.) 339, 358–9, 19 L.Ed. 955; Arizona Edison Co. v. Southern Sierras Power Co., 9 Cir., 17 F.2d 739, 740; see also Restatement, Contracts § 371. This discretionary limitation of its action by a court of equity in some ways resembles the traditional "exercise of the sound discretion" of a court of equity in cases of abstention, especially where there is involved a state's "well organized system of regulation." Burford v. Sun Oil Co., 319 U.S. 315, 327, 63 S.Ct. 1098, 87 L.Ed. 1424. An illustration of a decree retaining jurisdiction for future action is found in United States v. Parke, Davis & Co., 365 U.S. 125, 81 S.Ct. 433, 5 L.Ed.2d 457.

his rights were determined, citing Glaze v. Frost, 44 Or. 29, 74 P. 336. See also Doherty v. Pratt, 34 Nev. 343, 124 P. 574.

When the master's findings on the question of waste were challenged before the district court, it said in its opinion: "The evidence, as I have considered it in the record made before the master and as I have heard and observed it in the course of several proceedings before me, would, without doubt, have sustained a finding of waste by the master if we were concerned with the *usual water adjudication and* irrigation project or system. In my opinion the most impressive showing has been made with respect to the use of old, meandering natural channels for the conveyance of water and past failure to provide effective control and measuring devices. However, the latter practice has now been substantially corrected and the master in his report has set forth in a logical and persuasive manner reasons justifying the use of what would appear to be an antiquated and inefficient irrigation system. It is my conclusion that I should not disturb his findings and conclusions on this issue. It would be unjust and unreasonable to have required defendants to establish a modern and efficient irrigation program or system in view of the long standing efforts of the government to take from these users the waters it so improvidently relinquished in 1908. Defendants' water rights have been and will continue to be in doubt until a decree in this litigation is entered and made final. Clearly, had all parties to its litigation approached the problem in a more cooperative and conciliatory manner much earlier a less costly and more satisfactory solution would have been found than can possibly develop from a court decree."

▮▮▮ We cannot hold this determination of the trial judge to be clearly erroneous. We think that for another reason there is no practical necessity for any further findings, at this time, on this point. The master has found, as we have

noted, the appropriate duty of water to be one-half inch to the acre or one second foot per 100 acres, and we think that the self interest of the several water users will require them to make sure that they obtain the maximum benefit from the quantities of water permitted them by seeing to it that there is no waste. If this proves not to be true, and waste develops, the court, by retaining jurisdiction, will be able to correct that situation by appropriate orders.

We have noted that the master, in findings which were approved by the court, determined the number of acres on the various parcels of land, described in several answers, which were under irrigation in 1908. In general those findings cannot be said to be without support in the evidence. There are a few instances, however, in which we think that the record shows that a mistake has been made. These are listed in Appendix A attached to this opinion. The amounts of the corrected acreage are shown in column 3 of Appendix B.

▮▮▮ Another circumstance requires further modification of the total 1908 irrigated acreage found by the court. As we noted in our former opinion, "the right to the use of the 75 percent of the waters must have been limited to the needs as of 1908 of the particular individuals who were parties to the agreement," and "when the needs of those parties, [i. e. these particular individuals] were such as to require less * * * then their rights to the use of the water was correspondingly reduced, and those of the Indians, in like measure, greater." The findings show that in the cases of a substantial number of these particular individuals, or their successors, their needs and uses of water decreased after 1908. We previously alluded to this, noting that the use of water on certain tracts diminished so that the irrigated acreage on these parcels in 1957 was less than that found to have existed in 1908. The result of these findings are disclosed in the final column of Appendix B. We

must therefore modify the decree to reflect this diminution also.[19]

In consequence the rights of the defendants must be measured on a basis of 4696 acres.

The conclusions which we have reached here are such that a new trial of the case is unnecessary. A retrial would be most unfortunate. The parties should be informed now as to where they stand, and the unanimity of the evidence, to which we have previously alluded, makes our conclusion as to the extent of the 1908 water rights possible on this record.

Thus the Indian Tribe may now ascertain, by actual experience under the decree, just how badly they have suffered through the Code taking of their property. Plainly the waters they are here awarded will be insufficient for the irrigable lands of the Reservation.[20] Just how insufficient they can soon tell.

The judgment of the court below must be modified to reflect our holding here. Accordingly the cause is remanded with directions to modify the portion of the decree dividing the waters to read as follows: [21]

19. The manner in which the court arrived at the irrigated acreage in 1957 is outlined in Appendix I accompanying appellees' brief. Its determination is based on the testimony and exhibits furnished by the engineers, Jensen and Fiedler, and their exhibits. Their testimony was based upon measurements and field observations and outlined on aerial photographs and other exact maps of the area. These two witnesses, in giving the acreage irrigated as of 1957, made it plain that they were describing the condition then and in recent years, that is "within the last five to seven years." They examined the ground for evidence of irrigation "whether there were laterals leading from the head ditch, whether fields in the area had been corrugated," etc., in short, "whether I felt irrigation had taken place in the past on that field."

20. See the reference to their possible claim in footnote 25 in our former opinion, 236 F.2d at 339.

21. The corresponding portion of the decree as entered by the district court reads as follows:

"IT IS ORDERED, ADJUDGED and DECREED that the waters of Ahtanum Creek shall be and they are hereby divided between the parties to this action as follows:

a. To defendants, for use on their lands north of Ahtanum Creek, seventy-five percent of the natural flow of Ahtanum Creek, as measured at the north and south fork gauging stations, provided that when the said measured flow exceeds 76.3 cubic feet per second, defendants shall have no rights to the excess, except in subordination to the higher rights of the plaintiff.

b. To plaintiff, for use on Indian Reservation lands south of Ahtanum Creek, twenty-five percent of the natural flow of Ahtanum Creek, as measured at the north and south fork gauging stations; provided that when that natural flow as so measured exceeds 76.3 cubic feet per second all the excess over that figure is awarded to plaintiff, to the extent that the said water can be put to a beneficial use.

c. Plaintiff may divert such water from the south fork of Ahtanum Creek as can be beneficially used for the individual diversions into the Yakima Indian Reservation lying above the main Bureau of Indian Affairs diversion; provided, however, that the water diverted to such individual diversions shall be charged against and deducted from the over-all award set forth in (b) above.

d. To the plaintiff, for the lower Bureau of Indian Affairs diversion, a daily diversion of water representing five percent of the natural flow of Ahtanum Creek as measured at the north and south fork gauging stations. This award shall represent plaintiff's interest in the return flow of the main stem of Ahtanum Creek, and the award to defendants shall be conditioned upon plaintiff receiving this flow of water at the lower Bureau of Indian Affairs diversion.

e. To defendants, all the rest of the return flow in the main stem of Ahtanum Creek, and all the return flow in Hatton and Batchelor Creeks.

f. Any water loss which may occur between the north and south fork gauging stations, and the defendants Hatton Creek diversion, is to be absorbed by defendants, plaintiff being entitled to its full stated percentage of the measured flow, and defendants taking the balance."

The allowable diversion for the north side users of one second-foot per 100 acres based on 5718 acres, or 57.18 second-feet, does not appear in the decree

It is ordered, adjudged and decreed that the waters of Ahtanum Creek shall be and are hereby divided between the parties to this action in the following manner and at the following times, to-wit:

I

From the beginning of each irrigation season, in the spring of each year, to and including the tenth day of July of each such year, said waters shall be divided as follows:

a. To defendants, for use of their lands north of Ahtanum Creek, seventy-five per cent of the natural flow of Ahtanum Creek, as measured at the north and south gauging stations, provided that the total diversion for this purpose shall not exceed 46.96 cubic feet per second, and provided that when the said measured flow exceeds 62.59 cubic feet per second defendants shall have no right to the excess, except in subordination to the higher rights of the plaintiff.

b. To plaintiff, for use on Indian Reservation lands south of Ahtanum Creek, twenty-five per cent of the natural flow of Ahtanum Creek, as measured at the north and south gauging stations; provided that when that natural flow as so measured exceeds 62.59 cubic feet per second, all the excess over that figure is awarded to plaintiff, to the extent that the said water can be put to a beneficial use.

c. Plaintiff may divert such water from the south fork of Ahtanum Creek as can be beneficially used for the individual diversion into the Yakima Indian Reservation lying above the main Bureau of Indian Affairs diversion; provided, however, that the water diverted to such individual diversion shall be charged

against and deducted from the overall award set forth in "b" above.

d. To the plaintiff, for the lower Bureau of Indian Affairs diversion, a daily diversion of water representing five per cent of the natural flow of Ahtanum Creek as measured at the north and south fork gauging stations. This award shall represent plaintiff's interest in the return flow of the main stem of Ahtanum Creek, and the award to defendants shall be conditioned upon plaintiff receiving this flow of water at the lower Bureau of Indian Affairs diversion.

e. To defendants, all the rest of the return flow in the main stem of Ahtanum Creek, and all the return flow in Hatton and Batchelor Creeks.

f. Any water loss which may occur between the north and south fork gauging stations, and the defendants' Hatton Creek diversion, is to be absorbed by defendants; plaintiff being entitled to its full stated percentage of the measured flow, and defendants taking the balance.

II

After the tenth day of July in each year, all the waters of Ahtanum Creek shall be available to, and subject to diversion by, the plaintiff for use on Indian Reservation lands south of Ahtanum Creek, to the extent that the said water can be put to a beneficial use.

The judgment is ordered modified further by adding thereto the following:

The court reserves jurisdiction to make such further orders as may be necessary to preserve and protect the rights herein declared and established, should a subsequent change in the situation or condition of the parties hereto so require.

Remanded with directions.

---

in that form. The court in its conclusion stated this quantity as 57.2 cubic feet per second. The approximate figure of

76.3 was arrived at by adding one-third of 57.2 to that amount.

## APPENDIX A

### ERRORS IN FINDINGS AS TO THE 1908 ACREAGES

| Answer Number | Resulting Reduction In Acres | Explanation |
|---|---|---|
| 4 | 19 | In the findings, 19 acres of the 70 should have been attributed to Answer No. 73, and is a duplication. |
| 12 | 31 | No evidence supports any finding on the 1908 use. It is not clear from the witness's direct testimony that the 31 acres mentioned was the 1908 irrigated acreage. On cross-examination, the witness said, "That is all in pasture and that was in pasture at that time and brush." |
| 27 | 20 | Twenty acres found to have been irrigated in 1908 were in fact not owned by a 1908 signatory. |
| 53 | 8 | The witness said that in 1908 one-half of each of the two "40's" was irrigated, but the answer pleaded that one parcel was 40 acres and one was 24 acres. Thus, the evidence was that 32, not 40, acres were irrigated in 1908. |
| 69 | 3 | Apparently a clerical error rendered 25 acres as "28", see footnote 38 to Appendix I of "Appendix of Appellees." |
| 79 | 5 | On cross-examination the witness changed his testimony to 30 from 35 acres. |
| 124 | 33 | The 33 acres were sub-irrigated. (An appropriation from a stream requires diversion therefrom. Cf. Laws of Washington 1891 Ch. CXLII § 3.) |
| 128 | 6 | Out of a total of 5.5 acres, 5 acres were sub-irrigated, not 6.5. |
| 134 | 1 | The witness who said 5 acres were irrigated in 1908 also testified that one of the five acres is presently part of an airport. |

Answers 160, 163, 187, 188, 189, and 234, represent land formerly owned by one Cope in an 80 acre tract. Witness Croxford testified that 60 acres of Cope's 80 acres were irrigated in 1908. Thus, three-fourths of the present acreage of each of these answers is the amount properly allocable to each of the 1908 irrigated acreage. The revised allocations are as follows:

| Answer Number | Resulting Reduction In Acres | Explanation |
|---|---|---|
| 160 | +.71 | 10.71 acres |
| 163 | .43 | 7.57 " |
| 187 | +.16 | 4.16 " |
| 188 | +.64 | 30.64 " |
| 189 | .53 | 4.47 " |
| 234 | | (No finding was made as to Ans. 234; therefore the amount of 3 acres allocable to this answer is excluded.) |

| Answer Number | Resulting Reduction In Acres | Explanation |
|---|---|---|
| 170 | 3.08 | The answer pleaded that the parcel measured 34.92 acres. Witness Scouller said that 3 acres were not irrigated; thus the correct finding would be 31.92. |
| 179 | 35 | It appears from the answer itself that the land was not owned by a 1908 signatory. |
| 215 | 55 | The answer itself indicates that the land was not owned by a 1908 signatory. |
| 220 | 7.75 | According to the answer, parcels 3 and 4 measured 31.75 acres. Witness Croxford excluded from these parcels 4.5 acres as not irrigated in 1908; the net was therefore 27.25 acres. |
| 221 | 9 | The court found 64.1 acres irrigated in 1957. This must be in error as the answer shows only 62.88 acres in toto, not one of which was likely to be irrigated. The owner testified he irrigated 55 acres in 1957; the witness as to 1908 irrigation testified it was 6 acres less than in 1957; the 1908 total: 49 acres. |

## APPENDIX B

| Answer Number | Findings on 1908 Irrigated Acreage | Corrected 1908 Acreage See Appendix B | Findings on 1957 Irrigated Acreage | Lesser of 1908 or 1957 Findings as Corrected |
|---|---|---|---|---|
| 1 | 80 | | 151.7 | 80 |
| 2 | 90 | | 101.3 | 90 |
| 3 | 80 | | 72.2 | 72.2 |
| 4 | 70 | 51 | 47.1 | 47.1 |
| 5 | 67 | | 63.7 | 63.7 |
| 6 | 30 | | 37.6 | 30 |
| 7 | 12 | | 16.8 | 12 |
| 8 | 45 | | 53.9 | 45 |
| 10 | 41 | | 41.8 | 41 |
| 11 | 10 | | 17.8 | 10 |
| 12 | 31 | 0 | 37.4 | 0 |
| 13 | 45 | | 58.3 | 45 |
| 14 | 20 | | 15.3 | 15.3 |
| 15 | 20 | | 24.7 | 20 |
| 16 | 99 | | 99 | 99 |
| 17 | 18.8 | | 29.8 | 18.8 |
| 18 | 23.5 | | 23.5 | 23.5 |
| 19 | 18.5 | | 19.3 | 18.5 |
| 20 | 10 | | 2.0 | 2.0 |
| 21 | 8.3 | | 19.3 | 8.3 |
| 22 | 70 | | 48.1 | 48.1 |
| 23 | 25 | | 9.0 | 9.0 |
| 26 | 80 | | 32.7 | 32.7 |

| Answer Number | Findings on 1908 Irrigated Acreage | Corrected 1908 Acreage See Appendix B | Findings on 1957 Irrigated Acreage | Lesser of 1908 or 1957 Findings as Corrected |
|---|---|---|---|---|
| 27 | 55 | 35 | 24.92* | 24.92 |
| 28 | 10 | | 15.3 | 10 |
| 29 | 30 | | 43.9 | 30 |
| 31 | 50 | | 28.4 | 28.4 |
| 32 | 20 | | 22.9 | 20 |
| 33 | 15 | | 15.4 | 15 |
| 34 | 20 | | 20.3 | 20 |
| 35 | 3 | | 2.5 | 2.50 |
| 36 | 40 | | 57.5 | 40 |
| 37 | 57 | | 66.0 | 57 |
| 38 | 75 | | 204.1 | 75 |
| 39 | 45 | | 31.7 | 31.7 |
| 40 | 18 | | 10.5 | 10.5 |
| 41 | 92 | | 90.2 | 90.2 |
| 42 | 33 | | 33.8 | 33 |
| 43 | 73 | | 68.1 | 68.1 |
| 44 | 40 | | 45.9 | 40 |
| 45 | 70 | | 72.4 | 70 |
| 46 | 60 | | 110.6 | 60 |
| 47 | 100 | | 101.1 | 100 |
| 49 | 5 | | 17.9 | 5 |
| 50 | 70 | | 56.5 | 56.5 |
| 51 | 24 | | 32.3 | 24 |
| 52 | 20 | | 56.0 | 20 |
| 53 | 40 | 32 | 44.6 | 32 |
| 60 | 65 | | 68.9 | 65 |
| 63 | 2 | | 3.8 | 2 |
| 64 | 35 | | 70.4 | 35 |
| 65 | 13 | | 7.5 | 7.5 |
| 66 | 47 | | 57.8 | 47 |
| 68 | 8 | | 8.8 | 8 |
| 69 | 28 | 25 | 31.6 | 25 |
| 70 | 32 | | 30.5 | 30.5 |
| 72 | 60 | | 49.6 | 49.6 |
| 73 | 19 | | 18.9 | 18.9 |
| 74 | 19 | | 13.6 | 13.6 |
| 75 | 18 | | 18.5 | 18 |
| 76 | 75 | | 71.0 | 71.0 |
| 77 | 164 | | 169.4 | 164 |
| 78 | 150 | | 140.6 | 140.6 |
| 79 | 35 | 30 | 32.0 | 30 |
| 80 | 38 | | 8.4 | 8.4 |
| 90 | 60 | | 14.3 | 14.3 |
| 96 | 70 | | 57.0 | 57.0 |
| 98 | 70 | | 81.4 | 70 |
| 106 | 39 | | 34.8 | 34.8 |
| 107 | 75 | | 48.7 | 48.7 |

* See Appendix A, Ans. No. 27.

| Answer Number | Findings on 1908 Irrigated Acreage | Corrected 1908 Acreage See Appendix B | Findings on 1957 Irrigated Acreage | Lesser of 1908 or 1957 Findings as Corrected |
|---|---|---|---|---|
| 108 | 39 | | 33.4 | 33.4 |
| 112 | 39 | | 35.9 | 35.9 |
| 122 | 20 | | 30.4 | 20 |
| 124 | 34.5 | 1.5 | 35.7 | 1.5 |
| 125 | 20 | | 13.4 | 13.4 |
| 126 | 20 | | 21.1 | 20 |
| 127 | 15 | | 25.1 | 15 |
| 128 | 6.5 | .5 | 33.3 | 00.5 |
| 129 | 10 | | 18.5 | 10 |
| 130 | 8 | | 13.7 | 8 |
| 131 | 4 | | 2.6 | 2.6 |
| 132 | 50 | | 88.0 | 50 |
| 133 | 16 | | 28.0 | 16 |
| 134 | 5 | 4 | 12.9 | 4 |
| 135 | 16 | | 10.6 | 10.6 |
| 136 | 50 | | 74.7 | 50 |
| 137 | 20 | | 44.5 | 20 |
| 138 | 30 | | 25.4 | 25.4 |
| 140 | 35 | | 21.4 | 21.4 |
| 142 | 25 | | 38.0 | 25.0 |
| 143 | 40 | | 34.7 | 34.7 |
| 145 | 20 | | 76.9 | 20 |
| 151 | 150 | | 119.7 | 119.7 |
| 160 | 10 | 10.71 | 11.4 | 10.71 |
| 163 | 8 | 7.57 | 9.8 | 7.57 |
| 164 | 70 | | 75.8 | 70 |
| 165 | 10 | | 8.7 | 8.7 |
| 166 | 5 | | 3.5 | 3.5 |
| 167 | 10 | | 13.7 | 10 |
| 168 | 7 | | 16.0 | 7 |
| 170 | 35 | 31.92 | 10.5 | 10.5 |
| 172 | 10 | | 18.0 | 10 |
| 176 | 30 | | 5.7 | 5.7 |
| 178 | 50 | | 30.7 | 30.7 |
| 179 | 35 | 0 | 31.6 | 0 |
| 187 | 4 | 4.16 | 5.0 | 4.16 |
| 188 | 30 | 30.64 | 32.6 | 30.64 |
| 189 | 5.8 | 4.47 | 5.8 | 4.47 |
| 191 | 86 | | 85.9 | 85.9 |
| 215 | 55 | 0 | 34.9 | 0 |
| 216 | 170 | | 195.1 | 170 |
| 217 | 65 | | 88.6 | 65 |
| 219 | 70 | | 123.0 | 70 |
| 220 | 85 | 77.25 | 79.5 | 77.25 |
| 221 | 58 | 49 | 64.1 | 49 |
| John Cox | 955 | 954.9 | 654.9 | 654.9 |
| | | | | 4,695.72 acres |